In re Ronald M. WINER and Sydel
Winer, Debtors.

Bankruptcy No. 83 B 20152.

United States Bankruptcy Court,
S.D. New York.

April 27, 1984.

On Motion to Reopen Judgment
June 18, 1984.

Kera & Graubard, New York City, for debtors.

Finkelstein, Mauriello, Kaplan & Levine, Newburgh, N.Y., for Peoples Nat. Bank and Small Business Admin.

### DECISION ON MOTION OBJECTING TO CLAIM OF PEOPLES NATIONAL BANK

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The Chapter 13 debtors in this case object to the claim filed by Peoples National Bank based on a deficiency remaining after a sale of collateral which the debtors contend was not a commercially reasonable sale under Article 9 of the Uniform Commercial Code. The debtors' objection is directed towards the failure of the bank to notify them of the auction and the small return realized by the sale in relation to the

market value of the collateral sold. The bank claims that the debtors waived their right to notice of the sale as is now allowed by an amendment to Section 9–504(3) of the U.C.C. so that the sale may not be challenged.

### FACTS

1. In July 1977, Ronald Winer, one of the debtors in this case, and Amadeo Romano formed a corporation known as Family Pies of Rockland, Inc. ("Family Pies"), which was to operate a restaurant.

2. On August 9, 1977, Family Pies obtained a loan from the Peoples National Bank (the "Bank") in the amount of $65,000. This loan was guaranteed by the principals of Family Pies, Ronald Winer and Amodeo Romano, their wives, Sydel Winer and Beatrice Romano, and the Small Business Association ("SBA"). The individuals' guarantees were secured by mortgages on the residences owned by the Winers and Romanos.

3. The mortgage given by the Winers was a second mortgage on their home. Ronald Winer testified that an officer of the Bank led the Winers to believe that the mortgage given by the Romanos was also a second mortgage on their residence. In fact, the Romanos only transferred a third mortgage to secure the Bank's loan because two prior existing mortgages had attached to the property.

4. Paragraph 17 of the joint mortgage given by the Winers and Romanos clearly specifies two senior mortgages on the Romanos' home, a first mortgage of $40,000 in favor of Providence Savings & Loan Association and a second mortgage of $20,000 held by William P. Mifsud.

5. At the mortgage closing, the attorneys who represented Family Pies also acted as counsel for the Winers. That firm, Jacobson & Jacobson, had represented Mr. Romano for many years in his various business activities. The Winers apparently did not read paragraph 17 of the mortgage which disclosed the existing encumbrances on the Romanos' home, nor were they advised by any of those persons present, including their counsel, that the Romanos were only conveying a third mortgage. In any event, the debtors initialled paragraph 17 in the margin and executed the mortgage.

6. Ronald and Sydel Winer have been school teachers for their adult careers. They were not experienced business people at the time of the mortgage closing. Nevertheless, the Bank did not act unconscionably in obtaining a mortgage from the Winers. There was no evidence of undue pressure exerted upon the Winers by the Bank's officer. Nor is there clear and convincing proof that the Winers were defrauded into giving the mortgage. This is not a case of a failure to disclose material information because the mortgage document clearly revealed that the Romanos were only conveying a third mortgage to the Bank.

7. As further security for the loan, a security interest was given to the Bank covering all the personal property to be contained in the restaurant.

8. The loan made by the Bank fell into default on January 2, 1979 causing the balance of $61,039.66 plus interest to become due.

9. Subsequent to the default in the repayment of the loan, the personal property located at the restaurant securing the loan was seized and sold at public auction on July 20, 1979. No notice of this sale had been transmitted to the Winers nor had they waived their statutory right to such notice at this juncture. The only published notice of the Bank's auction sale was an advertisement which appeared in the New York Times on the day prior to the sale. This advertisement consisted of a single-column notice which did not itemize the assets which were to be sold. Abbot R. Jackson, an auctioneer and appraiser, characterized the advertisement as one intended for a "buy back" type of sale where the secured creditor seeks to purchase its collateral without attempting to attract outside buyers.

10. Two persons were present at the sale, the auctioneer and an employee of the Bank. The Bank's representative purchased the collateral for $100 and the Bank subsequently resold the property to the landlord of the premises, Americus Caramatti, for $7,500. The Bank applied the $7,500 received from the resale to reduce the Winers' obligation as though the auction had produced that amount.

11. There was unrefuted testimony that the value of the collateral sold by the Bank was approximately $27,500. Thus, the sale brought about $20,000 less than the value of the property, or between one-third and one-fourth of its actual worth.

12. In addition to executing upon the personalty to satisfy the debt, the bank commenced foreclosure proceedings against the Winers' home. This action was settled prior to actual foreclosure and the debtors signed an agreement dated January 14, 1980 extending and modifying the terms of the mortgage. The Winers agreed

> to pay said principal sum secured by said note and mortgage with interest, as above set forth and in general to comply with all of the terms and conditions of said note and mortgage, as modified and extended herein, and that all the terms of said note and mortgage shall remain in force and effect except as herein modified and extended, and *that there are no offsets or defenses to said note and mortgage....*

(emphasis added).

13. Following this agreement, the mortgage, as extended and modified, once again fell into default. After this second default, the Winers filed a joint petition under Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301–30.

14. The Bank filed a proof of claim dated May 3, 1983 in the sum of $67,786.16. The debtors have objected to the amount of this claim and seek to reduce it to $13,-372.31 on the grounds that the Bank impaired the Winers collateral by taking only a third mortgage from the Romanos and by

having conducted a commercially unreasonable sale of the personalty.

## DISCUSSION

In the absence of fraud or other wrongful acts, a person who signs a written contract is conclusively presumed to know its contents and to assent to them. *Imero Fiorentino Associates, Inc. v. Green,* 85 A.D.2d 419, 420, 447 N.Y.S.2d 942, 943 (1st Dep't 1982). Thus, the New York Court of Appeals has adhered to the long accepted principle that barring such wrongful conduct by the other party, one who signs a document is bound by its contents. *DaSilva v. Musso,* 53 N.Y.2d 543, 550, 428 N.E.2d 382, 386, 444 N.Y.S.2d 50, 54 (1981); *Florence v. Merchants Central Alarm Co.,* 51 N.Y.2d 793, 795, 412 N.E.2d 1317, 1318, 433 N.Y.S.2d 91, 92 (1980).

That the Winers may not have read paragraph 17 of the mortgage setting forth the existing mortgages on the Romanos' residence, of itself, does not relieve them of the effect of that provision. "[T]he law's teaching since *Pimpinello v. Swift & Co.,* 253 N.Y. 159, 170 N.E. 530 [1930] has been that if they *could* have read it, the fact that they did not is immaterial, absent evidence of fraud." *Florence v. Merchants Central Alarm Co.,* 51 N.Y.2d at 795, 412 N.E.2d at 1318; 433 N.Y.S.2d at 92.

It cannot be said that the Bank concealed from the Winers the fact that the Romanos had previously conveyed two mortgages on their home. The Winers were directed specifically to paragraph 17 of the mortgage which set forth these existing encumbrances and were asked to initial this clause in the margin. In view of the adequacy of this disclosure, there has been no showing of concealment with intent to defraud on the part of the Bank. Furthermore, there was an insufficiency of proof, indeed far short of the clear and convincing burden necessary to sustain a charge of fraud, that the attorney representing all four individual mortgagors acted in collusion with the Bank to obtain an unfair advantage for the Romanos. The attorney's prior representation of Mr. Romano

may have been in conflict with his role as counsel for the four mortgagors, but this ethical consideration does not amount to fraudulent conduct by the Bank. Without having presented the requisite proof showing fraud or wrongful conduct, the Winers must be bound to the terms of the mortgage.

Turning next to the sale of the personalty under U.C.C. § 9–504(3), the debtors correctly point out that by filing a claim in this Chapter 13 proceeding, the Bank has in effect sought to establish a deficiency against the debtors just as though there were no bankruptcy proceeding. If the debtors have a valid defense to the deficiency claim under state law, section 502(b)(1) of the Bankruptcy Code allows the defense to be asserted in the bankruptcy forum. Section 502(b)(1) provides that if an objection to a claim is made

> the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> (1) such claim is unenforceable against the debtor, and unenforceable against property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1).

■ Under Code § 502(b)(1), a bankruptcy court may set aside a claim filed against a Chapter 13 debtor where the claim is for a deficiency remaining after a commercially unreasonable sale due to inadequate notice of the sale. *See In re Lucas*, 28 B.R. 366, 370–71 (Bkrtcy.S.D.Ohio 1982). The same was true for Chapter XIII cases under the former Bankruptcy Act of 1898, as noted in *In re Collins*, 2 B.C.D. 555 (Bkrtcy.S.D.Ala.1976):

> Although claims filed in bankruptcy proceedings carry a prima facie validity, the burden of proof is always on the claimant; and where, as in this case, a secured party, after repossession and resale of the collateral, seeks a deficiency against the debtor, I am of the opinion,

and so hold, that he must prove compliance with the provisions of the Uniform Commercial Code relating thereto.

\*　　\*　　\*　　\*　　\*　　\*

> The evidence presented simply fails to show that the debtor received any notification of the intended disposition of the collateral; and absent such proof, the Bank is barred from any claim for a deficiency

*Id.* at 557 (citations omitted).

In the event of default by the debtor under a security agreement, the secured party has the right to "reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure." N.Y.U.C.C. § 9–501(1) (McKinney Supp.1983–1984). If the security holder chooses to liquidate the collateral and apply the proceeds to the outstanding debt, § 9–504(3) provides in part that

> every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.

N.Y.U.C.C. § 9–504(3) (McKinney Supp. 1983–1984). Assuming that the statutory notice requirement is met or a valid waiver is obtained, and the sale is in other respects commercially reasonable, the debtor is liable for any deficiency remaining thereafter. *Id.* § 9–504(2). Failure to comply with these Article 9 provisions, however, allows the debtor to recover from the secured party any loss caused by such noncompliance. N.Y.U.C.C. § 9–507 (McKinney 1964). The purpose of these requirements is to "insure that the debtor has an opportunity to redeem prior [to the sale] and that

the property is not sacrificed at a price below its actual value." *Sumner v. Extebank,* 88 A.D.2d 887, 888, 452 N.Y.S.2d 873, 874 (1st Dep't 1982) (citation omitted), *modified,* 58 N.Y.2d 1087, 449 N.E.2d 704, 462 N.Y.S.2d 810 (1983); *see Marine Midland Bank-Rochester v. Vaeth,* 88 Misc.2d 657, 659–60, 388 N.Y.S.2d 548, 550 (Sup.Ct. 1976).

■ The Bank has made a vague assertion that any defense to its claim for a deficiency judgment is untimely. The court has not been directed to any statute of limitations or other authority for this position. Indeed, the absence of a statute of limitations governing secured transactions under Article 9 has given rise to disputes as to whether the four year period of U.C.C. § 2–725 or some other statute of limitations should apply in this context. *See generally* Annot., 16 A.L.R. 4th 1336 (1982) (compiling cases demonstrating split of authority). The courts that have decided the issue have applied either the statute of limitations governing U.C.C. sales, more general contract claims or actions founded upon liabilities created by statute. The third of these alternatives, which is a three year statutory period in New York under C.P.L.R. § 214(2), has been rejected on the theory that the right to challenge an Article 9 sale, authorized by § 9–504(3), is a codification of pre-existing common law and is not merely a right created by statute. *See Sumner v. Century National Bank & Trust Co.,* 92 Misc.2d 726, 730–31, 402 N.Y.S.2d 285, 288–89 (Sup.Ct.1978). The debtors' objection, dated September 14, 1983, is therefore timely because it has been asserted within either of the two other possible limitation periods. The challenge was made within four years of the July 20, 1980 sale under U.C.C. § 7–205, or within six years of the more general contract statute of limitations provided by C.P. L.R. § 213(2).

■ In an action for a deficiency that remains after a sale of the collateral, the secured creditor is charged with the burden of affirmatively proving the commercial

reasonableness of the sale and that proper notice was given to the debtor. *E.g., General Electric Credit Corp. v. Durante Bros. & Sons, Inc.,* 79 A.D.2d 509, 510, 433 N.Y.S.2d 574, 576 (1st Dep't 1980); *Security Trust Co. v. Thomas,* 59 A.D.2d 242, 247, 399 N.Y.S.2d 511, 514 (4th Dep't 1977); *Banker's Trust Co. v. Steenburn,* 95 Misc.2d 967, 982, 409 N.Y.S.2d 51, 60–61 (Sup.Ct.1978), *aff'd,* 70 A.D.2d 786, 418 N.Y.S.2d 723 (4th Dep't 1979) (mem.). Notice of the sale must be provided to the debtor and to the guarantors as well, who are treated as debtors for the purposes of Article 9. *Chase Manhattan Bank v. Natarelli,* 93 Misc.2d 78, 89, 401 N.Y.S.2d 404, 412 (Sup.Ct.1977); N.Y.U.C.C. § 9–105(1)(d) (McKinney 1964); *see Executive Bank v. Tighe,* 54 N.Y.2d 330, 335, 429 N.E.2d 1054, 1056, 445 N.Y.S.2d 425, 427 (1981) (citing *Natarelli* with approval).

The Bank concedes that it was unable to prove that notice of the sale was sent to either Family Pies or the debtors as guarantors. Instead, the Bank relies on the extension agreement signed by the Winers on January 14, 1980, as a waiver of the debtors' right to prior notice of the public sale. This agreement was executed along with a stipulation of settlement *following* the sale of Family Pies' personal property which took place on July 20, 1979. The part of the agreement extending and modifying the mortgage upon which the Bank relies as a waiver of the right to notice states that "there are no offsets or defenses to said note and mortgage."

■ Prior to 1977, it was clear that the notice and commercial reasonableness requirements of § 9–504(3) could not be waived. *See* N.Y.U.C.C. § 9–501(3)(b) (McKinney 1964). In 1977, § 9–504(3) was amended to permit a debtor to renounce or modify his right to notice after default under the security agreement. Therefore, by the terms of the statute, the debtor's right to notice of a public sale of the collateral may be renounced or modified after default.[1]

---

**1.** The renunciation or modification permitted    by § 9–504(3) does not conflict with the no-

Neither the U.C.C. nor case law subsequent to the 1977 amendment appears to define what constitutes "a statement renouncing or modifying" the debtor's right to notification. In general, certain elements are required to establish a valid waiver. As was stated in *United States v. Bedford Associates*, 491 F.Supp. 851, 868, *modified*, 491 F.2d 1300 (2d Cir.1981), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982):

> A waiver is an intentional or voluntary relinquishment or abandonment of a known right. *Metro-Goldwyn-Mayer, Inc. v. Ross*, 509 F.2d 930, 933 n. 3 (2d Cir.1975); *City of New York v. State*, 40 N.Y.2d 659, 669, 357 N.E.2d 988, 995, 389 N.Y.S.2d 332, 340 (1976).

■ In this case, the debtors' right to notice was waived only if the post-sale statement that there were no offsets or defenses available to the Winers was a voluntary and intentional relinquishment of this right, and if the Winers knew of their right to receive such prior notice. Since waiver must be an intentional relinquishment, it cannot arise through mere negligence or inadvertence. The debtors must have known of their right to prior notice of the sale and have realized that they were renouncing that right. This knowledge is not to be imputed; "[t]here is, in this context, no presumption that all must know the law (*Municipal Metallic Bed Mfg. Corp. v. Dobbs*, 253 N.Y. 313, 171 N.E. 75)." *Byer v. City of New York*, 50 A.D.2d 771, 771, 377 N.Y.S.2d 52, 53 (1st Dep't 1975).

■ The debtors, Ronald and Sydel Winer, are school teachers and not sophisticated business people. They signed the extension and modification agreement in an effort to stave off an impending foreclosure on their home. The statement that there were no offsets or defenses was signed approximately six months after the sale of the personalty and the agreement made no reference to the sale. The evidence adduced does not establish that the Winers

knew of their right to notice of the sale, or that they intentionally waived this right. Since the extension and modification agreement does not amount to a valid waiver of the statutory right to notice, the question whether a waiver would be effective when made after default and after the sale, rather than after default only, as provided by § 9–504(3), need not be decided.

■ The final issue presented in this case concerns the effect of a failure to notify the debtor of a public sale under § 9–504(3). The text of the U.C.C. does not state that a lack of notice acts as a bar to the secured creditor recovering a deficiency judgment. Nor has the New York Court of Appeals answered this question. The appellate divisions of the State have taken three different approaches. The third department has held that non-compliance with the requirements of § 9–504(3) does not bar a secured party's right to a deficiency judgment and that the debtor's sole remedy is a setoff of losses under § 9–507(1). *See Stanchi v. Kemp*, 48 A.D.2d 973, 974, 370 N.Y.S.2d 26, 28 (3rd Dep't 1975). In contrast, in the second department, non-compliance with § 9–504(3) is an absolute bar to a deficiency judgment against the debtor. *See Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 826, 368 N.Y.S.2d 268, 270 (2nd Dep't 1975). Finally, the two remaining departments of the appellate division have adopted a middle ground approach creating a rebuttable presumption that the fair market value of the collateral equals the balance of the outstanding debt, so that a failure to give proper notice prevents a deficiency recovery unless the contrary is proven. *See General Electric Credit Corp. v. Durante Bros. & Sons, Inc.*, 79 A.D.2d 509, 510–11, 433 N.Y.S.2d 574, 577 (1st Dep't 1980); *Security Trust Company v. Thomas*, 59 A.D.2d 242, 247, 399 N.Y.S.2d 511, 514 (4th Dep't 1977). Although the split among New York courts has been

waiver provision of § 9–501(3). The debtor's recognized right to renounce or modify is em-

bodied in the "except as provided" language of § 9–501(3).

recognized and statutory change has been proposed,[2] the conflict remains.

While each of the three positions has some justifiable basis, the rebuttable presumption analysis appears to be most sound. The approach taken in *Stanchi,* making the debtor's sole remedy the setoff of losses caused by non-compliance, overlooks certain sections of the U.C.C. Nothing in the default provisions of Article 9 makes the offset provision of § 9–507(1) an exclusive remedy. *See Leasco Data Processing Equipment Corp. v. Atlas Shirt Company,* 66 Misc.2d 1089, 1091–92, 323 N.Y.S.2d 13, 16–17 (Civ.Ct.1971). The law in New York existing prior to the enactment of the U.C.C. which supplements its provisions unless otherwise displaced under § 1–103, made a deficiency judgment dependent upon precise compliance with the notice requirement. *Atlas Shirt Co.,* 66 Misc.2d at 1090, 323 N.Y.S.2d at 15. This alternative remedy should be available to the debtor under § 1–103. The bar on recovering a deficiency for failing to give notice, however, should not be absolute. Such an inflexible rule might cause too harsh a result particularly where the sale's return approaches the value of the collateral and apart from the lack of notice to the debtor, the sale is conducted in a commercially reasonable manner, e.g. with sufficient advertising designed to attract outside prospective bidders. The rebuttable presumption procedure leaves room for such consideration and for this reason it is more attractive. The application of this test was stated in *Security Trust Co. of Rochester v. Thomas* as follows:

> We conclude that the proper and equitable construction of the Uniform Commercial Code with respect to sales of collateral upon the debtor's default, made without statutory notice or not in a commercially reasonable manner, is in accordance with this middle ground position [i.e., the rebuttable presumption approach]. A secured creditor who has liquidated his security may maintain an action for a deficiency judgment. He has

the burden to prove, however, that due notice of sale as provided by law was given to the debtor and that the sale was commercially reasonable. *Failing in such proof, he may still recover a deficiency judgment by proving the amount of the debt, the fair value of the security and the resulting deficiency.*

59 A.D.2d at 247, 399 N.Y.S.2d at 514 (emphasis added) (footnote omitted).

█ Applying the preferred middle ground approach to the instant case, it is clear that no notice of the sale was sent to the debtors. This raises the presumption that a deficiency judgment should be disallowed. However, the debtors' own evidence established a value of $27,500 for the collateral. This was an unusual case where the debtor, rather than the creditor, proved that the balance of the debt owed greatly exceeded the value of the security; the Bank had little reason to challenge the debtors' valuation evidence. Although the secured party is usually obligated to prove that the debt owed exceeds the value of the collateral, it is sufficient that the debtors' unrefuted evidence established this fact. Thus, the rebuttable presumption approach does not prevent the secured party from recovering a deficiency because the debt to the Bank was proven to be greater than the value ascribed to the security. The deficiency which resulted from the sale under this approach is the amount of the debt, $67,786.16, less the fair value of the security which was not received upon its disposition, i.e. the $20,000 difference between the $27,500 value and the $7,500 actually credited to the Winers, amounting to $47,786.16. Accordingly, the proof of claim filed by the Bank for $67,786.16 shall be reduced to $47,786.16.

### CONCLUSIONS OF LAW

1. The debtors are bound by law to the terms of the second mortgage they gave to

---

**2.** *See* Memorandum of the Law Revision Commission Relating to the Right of a Secured Party to Recover a Deficiency Judgment Under Part 5

of Article 9 of the New York Uniform Commercial Code, *reprinted in* 1983 N.Y.Laws A–385.

the Bank, even though the Romanos conveyed only a third mortgage on their residence.

2. The debtors were not defrauded into giving the Bank a second mortgage on their home.

3. The lack of notice afforded the debtors raises a presumption that the Bank is not entitled to a deficiency judgment.

4. The Bank adequately rebutted this presumption but, nevertheless, may not claim a deficiency to the extent of $20,000.

5. The Bank's proof of claim shall be allowed to the extent of $47,786.16.

SUBMIT ORDER on notice.

## ON MOTION TO REOPEN JUDGMENT

The debtors in this Chapter 13 proceeding, Ronald and Sydel Winer, seek to reopen a judgment of this court entered on April 27, 1984 which granted in part the debtors' motion objecting to a claim filed by Peoples National Bank (the "Bank"). By way of motion under Bankruptcy Rule 9023 which incorporates Fed.R.Civ.P. 59 in bankruptcy cases, the debtors urge the court to amend its findings of fact, make additional findings of fact and take additional testimony with respect to this prior decision.

■■■■ A motion to reopen proceedings under Fed.R.Civ.P. 59 is addressed to the sound discretion of the trial court. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331–32, 91 S.Ct. 795, 802–03, 28 L.Ed.2d 77 (1971); *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 342 (2d Cir.1983). Relief under Rule 59(a) is limited to manifest misapprehension of the law or mistake of fact. 25 Federal Procedure L.Ed. § 58.13, at 750 (T. Goger ed. 1984); *see* 2 J. Moore, Federal Practice and Procedure Manual § 24.01[2], at 24–8 to 24–9 (1983). The following seven arguments advanced by the debtors fail to meet these established requirements for reopening a proceeding under Rule 59(a) and the motion to reopen is accordingly denied.

First, the debtors contest the characterization of the Bank's security interest in the personalty contained in the restaurant as "further collateral" for the Bank's loan. This description of the collateral does not address whether the personal or real property was the primary collateral pledged as security for the loan. Moreover, such a distinction has no bearing on the court's decision because the Bank found it necessary to foreclose upon all the property securing the loan.

Second, an argument is made that the Bank impaired the Winers' collateral when it did not introduce a handwriting sample of Beatrice Romano to contest the authenticity of her signature in the surplus money proceeding. In his report dated January 28, 1982 (Exhibit 1), the referee stated in his first conclusion of law that there was "no credible proof presented rebutting the authenticity of Beatrice Romano's signature." There is no evidence of any challenge to the referee's report by any party with an interest in setting aside the Mifsud mortgage. At this late stage it would undermine the policy of finality with regard to the state court surplus money proceeding to undertake a separate inquiry of the Mifsud mortgage or to review the referee's determination upholding the validity of this mortgage.

■■■ Third, the debtors claim that the Bank's failure to obtain a second mortgage from the Romanos as set forth in the S.B.A. Authorization and Loan Agreement breached an obligation owed to the debtors as third-party beneficiaries of this agreement. This argument was not raised at trial or in the debtors' post trial memorandum and is therefore an improper basis for a Rule 59(a) motion to reopen. *See* 2 J. Moore, *supra*, § 24.01[2], at 24–8. Additionally, it is unlikely that the debtors are in fact third-party beneficiaries of the S.B.A. agreement. The requirement that the Bank obtain a second mortgage was not intended to benefit the debtors; rather, it was designed to protect the S.B.A. as guarantor of the loan in the event of default. The debtors appear to be more in the nature of incidental beneficiaries of the

S.B.A. agreement who may not sue upon the terms of the contract.

Fourth, the debtors allege that the Bank owed the debtors a fiduciary duty of disclosure by virtue of the possible subrogation rights passing to the debtors in the event that the debtors had to satisfy more than their share of the Bank's claim. This argument cannot be sustained in view of this court's earlier finding of adequate disclosure. The presence of a special relationship does not affect the outcome in this case because the Bank did reveal the Mifsud mortgage in paragraph 17 of the mortgage which the debtors initialed in the margin.

 Fifth, the debtors claim the right to void the contract with the Bank under the mistake doctrine of contract law. As indicated in this court's prior decision, a party executing a document is bound to the terms of the instrument. The failure to read the contents of the mortgage may have been imprudent, but it does not constitute the type of mistake to form a legal basis to void the transaction.

Sixth, the debtors label as improper the use of their own valuation evidence in determining the extent to which their collateral was impaired. The debtors' introduction of the valuation evidence was a strategical decision which counsel made at trial. The court granted counsel's oral application to reopen the record at the conclusion of the trial to allow testimony to be elicited regarding the value of the collateral sold by the Bank. Once this request was granted without any limitation placed on the use of the valuation evidence, it was left to the court to determine its relevance and probative value.

Finally, the debtors object to the use of liquidation value in ascribing the worth of the personalty sold by the Bank pursuant to its security interest. At trial, there was no credible or nonspeculative valuation evidence presented besides the $27,500 amount attributed to the property under the liquidation analysis offered by the debtors' own witness. Additionally,

the Bank did not conduct the sale as a going-concern nor could it have done so because it possessed no interest in the real property where the collateral for sale was located. If the sale had been properly advertised in conformity with the provisions of Article 9 of the U.C.C., the bank would have been required to offer the collateral under liquidation conditions. The defect in noticing the sale entitles the debtors only to reimbursement for the impaired return from the liquidation sale caused by the deficiency in notice.

The debtors have not demonstrated a manifest misapprehension of the law or mistake of fact warranting a reopening of the record under Fed.R.Civ.P. 59(a) and the motion to reopen is accordingly denied.

SO ORDERED.