Stephen BENINATI, Plaintiff,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION As Receiver for Community National Bank and Trust Company of New York, and Federal Deposit Insurance Corporation in its individual corporate capacity, Defendants.**

No. 96 CV 3665(RJD).

United States District Court,
E.D. New York.

July 13, 1999.

Andrew M. Schnier, New York City, for plaintiff.

Marc E. Wieman, Federal Deposit Insurance Corporation, New York City, Thomas A. McFarland, on behalf of Zachary W. Carter, United States Attorney, for the Eastern District of New York, Brooklyn, NY, for defendants.

### MEMORANDUM & ORDER

DEARIE, District Judge.

Defendant Federal Deposit Insurance Corporation moves to dismiss the complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Stephen Beninati cross moves to amend his complaint to add the United States as a defendant.

Defendant's motion to dismiss is granted. Plaintiff's motion to amend the complaint is denied.

### BACKGROUND

Plaintiff brings this action pursuant to 12 U.S.C. § 1821(d)(5) seeking damages in the amount of $5,000,000. The complaint alleges that the FDIC breached its "fiduciary duty and its duty to act in good faith" and that it tortiously interfered with plaintiff's rights under a shareholders' agreement.

In 1976, plaintiff Stephen Beninati ("Beninati") and Richard Nicotra ("Nicotra") co-founded Everything Yogurt, Inc. ("EYI"). Beninati and Nicotra each owned 47.5% of the outstanding common shares of EYI, and Kenneth Kaplan ("Kaplan") owned the remaining 5%. Stat. of Undisputed Facts ¶¶ 1–2. On October 3, 1991, EYI entered into a Loan Consolidation and Modification Agreement (the "Loan Agreement") with Community National Bank and Trust Co. of New York ("CNB"). *Id.* at ¶ 3; Def.'s Aff. in Supp. of Summ.J.Ex. 3. The face amount of the

loan was $1,000,000. When CNB initially loaned the funds to EYI, Beninati and Nicotra pledged their shares in EYI pursuant to a Stock Pledge and Security Agreement (the "Pledge Agreement").[1] Stat. of Undisputed Facts ¶ 4; Stock Pledge and Security Agreement at Def.'s Aff. in Supp. of Summ.J.Ex. 4.

Under the Pledge Agreement, upon a default, CNB had the right to "sell, assign, give an option or options to purchase, contract to sell or otherwise dispose of and deliver ... [the] pledged stock." Pledge Agreement ¶ 2(e). CNB was obligated to send each of the stockholders notice ten days prior to the time of any sale or disposition of the pledged stock. *Id.* ¶ 2(f). The stockholders retained the right to vote the pledged stock until the occurrence of a default. *Id.* at ¶ 2(c). Upon a default, CNB had the right to exercise voting and all other corporate rights. *Id.* In the event that CNB could not dispose of the pledged stock in a public sale, the Agreement expressly permitted CNB to dispose of the shares through private sales. *Id.* at ¶ 5. The Agreement also explains that "[t]he Stockholders acknowledge that any such private sales may be at places and on terms less favorable to CNB than if sold in public sales and agree that such private sales shall be deemed to have been made in a commercially reasonable manner." *Id.* Finally, the parties agreed that CNB's rights under the Pledge Agreement were "superior to any rights that any signatory [to the pledge agreement] may have under" agreements between or among EYI and its stockholders and the stockholders themselves. *Id.*

On November 8, 1991, CNB was declared insolvent and the Federal Deposit Insurance Corporation ("FDIC") was appointed as Receiver. Stat. of Undisputed Facts at ¶ 5. As Receiver, the FDIC took possession of the EYI note. Beninati al-

---

1. At the time EYI and CNB entered into the modified loan agreement in 1991, they also executed an agreement that expressly stated that the original Pledge agreement was "in full force and effect." *See* Stock Pledge Acknowledgment and Reaffirmation Agreement at Def.'s Aff. in Supp. of Summ.J. Ex. 5.

leges that around the time CNB was declared insolvent, he and Nicotra became increasingly at odds over management issues of EYI. Pl.'s Aff. in Opp'n to Summ.J. ¶ 2. Sometime in late 1991, EYI stopped making full monthly payments on the loan and in May 1992 stopped making any payments. Stat. Of Undisputed Facts ¶¶ 7–8.

According to plaintiff, in August of 1992, Nicotra and Kaplan, the 5% shareholder, held a Special Meeting of the EYI Board of Directors and terminated plaintiff as President. Pl.'s Aff. in Opp'n to Summ.J. ¶ 2. Shortly thereafter, they terminated him as Director, thereby precluding his involvement with EYI's affairs. *Id.* Beninati filed a summons and complaint in New York Supreme Court, Richmond County, based upon Nicotra's and Kaplan's actions. Beninati's Aff. in Opp'n to Summ.J. ¶ 2. Beninati alleged that their actions were contrary to a Shareholders Agreement that guaranteed Beninati employment and barred any significant decisions affecting EYI without consent of both Beninati and Nicotra. *Id.; see also* EYI Shareholders' Buy Sell Agreement, Def.'s Aff. in Supp. of Summ.J.Ex. 9.

Around the time that Beninati commenced the state action against Nicotra and Kaplan, the FDIC declared EYI's note to be in default and notified Beninati and Nicotra accordingly. Stat. Of Undisputed Facts ¶¶ 8, 9. The FDIC proceeded to engage in negotiations with Nicotra and other unnamed representatives of EYI regarding the liquidation of the loan obligation. Beninati Aff. in Opp'n to Summ. J.Ex. A. Plaintiff alleges that he tried to participate in these negotiations, but that the FDIC did not allow him to do so. *Id.* at ¶ 4.

Instead, Beninati alleges, the FDIC conducted separate negotiations with him. In a letter dated June 28, 1993, the FDIC notified Beninati's attorney that it would be "accepting bids from parties interested in purchasing the Everything Yogurt stock pledged by ... Beninati." Def.'s Aff. in Opp'n to Summ.J.Ex. 12. Beninati alleges that in subsequent negotiations with the FDIC, the FDIC misled him by suggesting that it would only consider offers sufficient to liquidate the entire EYI obligation, not portions of it. Pl.'s Aff. in Opp'n to Summ.J. ¶ 3. Plaintiff also alleges that the FDIC never indicated that it would consider offers for his shares alone. *Id.* Plaintiff concedes he was financially unable to purchase either the entire note or his shares. *Id.* Beninati alleges, however, "with the assistance of others" he would have be able to make an offer for his shares "in excess of that which was accepted by the FDIC from ... Nicotra." *Id.* at ¶ 5. Beninati contends that he did not make such an offer because he relied on the FDIC's representation that it would only consider offers for the full amount of the debt.

On August 23, 1993, the FDIC sold Beninati's shares in EYI to Nicotra for $ 210,-000.00, on a deferred payment basis. Stat. of Undisputed Facts ¶¶ 10–11; Beninati Aff. in Opp'n to Summ.J ¶ 3. At the same time, the FDIC sold the EYI note and remaining collateral[2] to Colombo, Inc. ("Colombo") for $735,000.

On November 25, 1994, Beninati commenced an action in the New York Supreme Court, Richmond County, against Nicotra, Colombo, and the FDIC, claiming that the transfer of stock to Nicotra and the sale of the EYI note to Colombo was fraudulent and, therefore, should be voided. The FDIC was dismissed from the action due to Beninati's failure to exhaust his administrative remedies as mandated by 12 U.S.C. § 1821(d). Stat. of Undisputed Facts ¶ 14. On September 8, 1995, after the FDIC was dismissed from the state court action, Beninati filed a claim with the FDIC. *Id.* at ¶ 15. However, the claim did not specify an amount. A supplemental claim was filed on November 29, 1995. After receiving a final notice of denial, Beninati commenced the instant action against the FDIC in this Court. In

---

2. Apparently, certain real estate was pledged along with the EYI stock.

its answer, the FDIC admits that plaintiff served the Notice of Claim in a timely manner. Answer ¶ 3.

In sum, the complaint sets forth two claims. The first claim alleges that the FDIC tortiously interfered with plaintiff's right under the Shareholder's Agreement entered into by plaintiff, Nicotra, and Kaplan. The second claim alleges that the FDIC, by its actions of selling plaintiff's stock to Nicotra and the EYI note to Colombo, breached its "fiduciary" duty to act in good faith and its duty to dispose of plaintiff's collateral in a commercially reasonable manner.

## DISCUSSION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure summary judgment is appropriate when "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986). The burden is especially heavy as "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). For the reasons stated below, the Court concludes that plaintiff's claims are contract claims and, therefore, the FDIC is a proper defendant and subject to suit in this Court. However, this Court also concludes that plaintiff's contract claims fail as a matter of law. Defendant's summary judgment motion is granted. Plaintiff's motion to amend the complaint is denied on the basis that any such amendment would be futile.

### A. Who is the Proper Defendant?

Defendant FDIC argues that the complaint should be dismissed on the basis that it is not the proper defendant. Plaintiff requests that if this Court concludes that the FDIC is not the proper defendant, it be allowed to amend its complaint to add

the United States as a defendant. Both the United States and the FDIC oppose plaintiff's motion for leave to amend on the basis that an amendment would be futile.

■ FDIC argues that the doctrine of sovereign immunity and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) *et seq.*, preclude this action from being brought against it. It is well established that, absent express consent, the United States and its agencies are immune from suits involving money damages. *Lehman v. Nakshian*, 453 U.S. 156, 160, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981); *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). The FTCA constitutes a limited waiver of sovereign immunity and is the exclusive remedy against the United States or one of its agencies for money damages based on tort actions. 28 U.S.C. § 2679; *Guiraldes De Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998) (citing *Dalehite v. United States*, 346 U.S. 15, 30–36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)).

■ The FTCA does not waive immunity with regard to all torts. Specifically, claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights" are excluded. 28 U.S.C. § 2680(h). Finally, tort claims asserted against a federal agency under the FTCA must be brought against the United States, not the agency itself. *Sprecher v. Graber*, 716 F.2d 968 (2d Cir.1983).

■ Suits against the FDIC, however, may be appropriate under certain circumstances. The FDIC has the statutory power "to sue and be sued, and complain and defend, in any court of law or equity, State or Federal." 12 U.S.C. § 1819. This statutory power does not "authorize suits against [a federal agency] on claims which are cognizable under [the FTCA]." 28 U.S.C. § 2679(a). In other words, if a claim is cognizable under the FTCA, a

claimant must proceed under the FTCA regardless of the agency's "sue or be sued" clause. *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Only claims that are not actionable under the FTCA may be brought directly against the FDIC. *Id.* at 477, 114 S.Ct. 996.

Therefore, if plaintiff's claims are tort claims cognizable under the FTCA, it is clear that plaintiff should have brought the action against the United States, not the FDIC, and the complaint should be dismissed against the FDIC. Plaintiff requests that if the Court concludes that his claims are tort claims that it should be permitted to amend its complaint to add the United States as a defendant. If plaintiff's claims are tort actions, the Court would readily permit amendment of the complaint.

If the complaint alleges breach of contract claims, however, the complaint properly names the FDIC as defendant. Under the "sue and be sued" clause, plaintiff could proceed with the contract claims in this Court. This Court has subject matter jurisdiction over the controversy by virtue of 12 U.S.C. § 1819(b)(2). The subsection states, "all suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States."

If plaintiff's claims sound in contract and are cognizable against the United States under the Tucker Act, the Court of Claims has exclusive jurisdiction because plaintiff seeks in excess of $10,000 in damages. Plaintiff seeks to amend his complaint to add the United States and invites the Court to transfer the case against the United States to the Court of Claims in the interests of justice.

## B. What is the nature of plaintiff's claims?

Plaintiff's first claim alleges that the FDIC "tortiously interfered" with his contract with the EYI shareholders. Compl. ¶ 37. Plaintiff concedes that such a claim is expressly excluded from the FTCA. Pl.'s Memo. Of Law in Opp'n to Summ.J. at 17. However, plaintiff contends that "it was pleaded, not as a separate cause of action, but as just one more act which supports [p]laintiff's claim that the FDIC breached its U.C.C. and common law duties to act in good faith and to deal fairly and in a commercially reasonable manner with [p]laintiff."[3] *Id.*

Plaintiff's second claim alleges that the FDIC breached its "fiduciary duty and its duty to act in good faith." Compl. ¶ 39. Plaintiff asserts that these duties were implied by law in both the Loan and Pledge Agreements. Plaintiff's claim is based on New York common law and the duty of "commercial reasonableness" imposed by the New York Uniform Commercial Code ("UCC").

■ It is clear under New York law that "parties to an express contract are bound by an implied duty of good faith" and fair dealing. *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992). It is also clear that a claim for breach of an implied duty of good faith and fair dealing is a "breach of the underlying contract," not a tort claim. *See Fasolino Foods Co.,* 961 F.2d at 1056; *Durham Indus., Inc. v. North River Ins. Co.,* 673 F.2d 37, 41 (2d Cir. 1982) (reasoning that punitive damages are not available for breach of the implied duty of good faith and fair dealing); *Geler v. National Westminster Bank,* 770 F.Supp. 210, 214 (S.D.N.Y.1991) (holding breach of implied duty of good faith is "merely a breach of the underlying contract"). *But see Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d

**3.** The complaint clearly alleges tortious interference with contractual rights as a separate claim. Based on plaintiff's statements, to the extent that the complaint does allege a claim of tortious interference, it is dismissed.

232, 448 N.E.2d 86 (1983) (refusing to imply a duty of good faith and fair dealing in "at-will" employment contracts).

■ Similarly, Section 9–504(3) of the UCC requires that a secured party dispose of collateral in a commercially reasonable manner. N.Y.U.C.C. § 9–504(3). The purpose of § 9–504(3) is to ensure that a debtor has the opportunity to redeem his collateral. *Sumner v. Extebank*, 88 A.D.2d 887, 888, 452 N.Y.S.2d 873 (1st Dep't 1982). However, unlike the breach of the common law duty of good faith and fair dealing, it is not clear whether a breach of the duty of commercial reasonableness is a tort or a breach of contract action. Plaintiff relies on an unpublished district court opinion for the proposition that breach would be a tort claim cognizable under the FTCA. *SeeMadison Consultants v. Federal Deposit Ins. Corp.*, 76 CV 4348, 1979 U.S.Dist. LEXIS 14316 (S.D.N.Y. Feb. 21, 1979). In *Madison*, the court concluded, without explanation, that the claim that the FDIC "failed to discharge its obligations under Article 9 of the Uniform Commercial Code is a tort claim cognizable under the FTCA." *Id.* at *5. The claim was nevertheless dismissed because plaintiffs had failed to exhaust their administrative remedies. *Id.*

The United States relies on a New York Supreme Court case for the proposition that a breach of the duty of commercial reasonableness is a contract claim. *See Sumner v. Century Nat'l Bank and Trust Co.*, 92 Misc.2d 726, 730, 402 N.Y.S.2d 285 (Sup.Ct. New York County 1978). The court reasoned that § 9–504(3) codified the common law rule that where personal property "is deposited or pledged as security for a debt ... duties and relations" are created between the parties. *Id.* at 730, 402 N.Y.S.2d 285. The court concluded that a breach of the duty of commercial reasonableness was not founded on negligence and, therefore, the general contract statute of limitations applied to the claim. *Id.* Other courts, relying on *Sumner* have also summarily concluded that the general

contracts statute of limitations applies to claims based on a violation of § 9–504(3). *Banca Commerciale Italianan v. Northern Trust Int'l Banking Corp.*, No. 95 CV 10700, 1997 WL 217591, *3 (S.D.N.Y.1997); *In re Winer*, 39 B.R. 504, 509 (Bankr. S.D.N.Y.1984).

■ This Court concludes that the breach of the duty of commercial reasonableness is a breach of contract claim. The duty of commercial reasonableness arises from a contract between a debtor and creditor. In essence, the UCC implies the duty just as New York common law implies the duty of good faith into contracts. As such the duty is part of the contract. The failure to act in good faith violates the contract. The dimension of such a duty cannot be defined without reference to the underlying contractual relationship of the parties. As such, an aggrieved party's remedy is a contract claim.

■ Furthermore, even if this Court were to conclude that a breach of the duty of commercial reasonableness was a tort, plaintiff would be unable to demonstrate that it was a tort actionable under the FTCA. As stated above, the FTCA specifically excludes the tort of misrepresentation. The Court must "look beyond the literal meaning of the language [of the complaint] to ascertain the real" claim alleged by the plaintiff. *United States v. Neustadt*, 366 U.S. 696, 703, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). In *Neustadt*, the Supreme Court held that plaintiff's allegation that the government breached a "duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs" was a misrepresentation claim, specifically excluded by the FTCA. *Id.* at 706, 81 S.Ct. 1294.

Beninati alleges that the FDIC breached various duties. However, a closer examination of the allegations demonstrates that plaintiff's underlying claim is that the FDIC lied to him during settlement nego-

tiations. Specifically, plaintiff claims that the FDIC misled him about the nature of the offers that it would accept and that it was negotiating separately with Nicotra and Colombo. The essence of the complaint is misrepresentation. Therefore, even if the plaintiff's claim that the FDIC breached a duty of good faith and commercial reasonableness is a tort, it is not actionable under the FTCA.

In sum, the claims asserted sound in contract and may therefore be brought against the FDIC in this Court. The FTCA is not applicable to this action. Leaving aside, for the moment, the issue of whether this Court should allow plaintiff to amend the complaint to add the United States and then subsequently transfer the action to the Court of Claims, the Court now turns to defendant FDIC's motion for summary judgment.

### C. Is the FDIC Entitled to Judgment as a Matter of Law?

Defendant FDIC argues that even if this Court concludes that plaintiff's claims are contract claims, it is entitled to summary judgment. First, FDIC argues that it had a contractual right to sell plaintiff's EYI shares under the Pledge Agreement. Second, it argues that plaintiff has no damages. Third, it argues that even if plaintiff has damages, FDIC'S actions were not the cause of those damages. Finally, FDIC argues that there was no breach of any implied duty of good faith or commercial reasonableness.

It is undisputed that the FDIC, as receiver for CNB, had a right to sell plaintiff's shares based upon EYI's default. The Pledge Agreement entered into by Beninati and CNB clearly gave CNB the right to sell his EYI stock in the event of a default. Under the terms of the Pledge Agreement, CNB had the right to sell the stock in either public or private sales, upon notice to the shareholders.

Defendant's argument that plaintiff has no damages must be rejected. The basis for defendant's argument is a Financial Statement submitted by plaintiff to the FDIC in March 1993, before the FDIC declared that the EYI note was in default. The Financial Statement was originally submitted to the New York Supreme Court pursuant to a divorce action. In the Financial Statement plaintiff valued his EYI shares as worthless. Plaintiff claims that the valuation was merely meant to demonstrate that the stock not a marital asset subject to equitable distribution. Beninati Aff. in Opp'n to Summ.J. ¶¶ 8–9. Defendant argues that plaintiff should be bound by the representation. Certainly plaintiff's admission and the curious explanation that accompanies it would be prominently featured were this case to proceed to a trial on the merits. However, this is a factual issue not subject to disposition on summary judgment.

The FDIC also argues that its actions, even if wrongful, were not the cause of plaintiff's damages. FDIC asserts that it informed plaintiff on June 23, 1993 that it would be accepting bids for the EYI stock until July 1, 1993. Plaintiff did not submit a bid. However, plaintiff alleges that he did not submit a bid because the FDIC misled him about the amount of bid it would consider. Beninati Aff. in Opp'n to Summ.J. ¶ 5. Similar to the issue of damages, the Court cannot conclude as a matter of law, that FDIC's actions were not the cause of plaintiff's alleged loss.

Finally, defendant argues that its actions did not constitute a breach of the duty of good faith or commercial reasonableness. New York case law defines the duty of good faith and fair dealing as an " 'implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Bank of New York v. Sasson*, 786 F.Supp. 349, 353 (S.D.N.Y.1992) (citing *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163 (1933) and *Components Direct, Inc. v. European American Bank and Trust Co.*, 175 A.D.2d

227, 572 N.Y.S.2d 359 (2d Dep't 1991)). The FDIC contends that the transaction with Nicotra and Colombo was simply an arms length business transaction and that it did not do anything to interfere with any rights that Beninati may have had under either the Pledge or Loan Agreement.

At the time that the FDIC sold Beninati's stock to Nicotra and the note to Colombo, the EYI loan was in default. Under both the Pledge and Loan agreements, the FDIC had a right to sell the shares either in a public or private sale. The only requirement under the Agreements was that the FDIC give notice to the shareholders of the impending sale. Beninati had no right to purchase all or part of his shares back from the FDIC. Plaintiff argues that the FDIC "froze [him] out of its negotiations with EYI ... despite the fact that it was in possession of an [a]greement that made it incumbent on EYI, if not the FDIC, to obtain [his] consent to any deal between EYI and the FDIC." Pl.'s Memo. in Opp'n to Summ.J. at 25. However, the Pledge agreement provides that upon a default CNB had the right to exercise voting and all other corporate rights. In addition, the documents clearly indicated that CNB's rights were superior to any right that a signatory may have under other agreements between EYI and its shareholders or among the shareholders. Beninati's consent to the sale of his pledged shares was not necessary. Nor did Beninati have the right to vote against the sale of the note to Colombo.

The implied duty of good faith and fair dealing does not require "the promisor to take actions contrary to his own economic interest." *Bank of New York*, 786 F.Supp. at 353. Nor does the duty extend beyond the termination of the contract or require a *de facto* re-writing of the contract. *See Spanierman Gallery Profit Sharing Plan v. Arnold*, 95 CV 4468, 1997 WL 139522, *3 (S.D.N.Y. Mar.27, 1997) (stating duty of good faith does not extend to future negotiations); *Village On Canon v. Bankers Trust Co.*, 920 F.Supp. 520, 535 (S.D.N.Y.1996) (holding that the duty of good faith and fair dealing is "limited to performance under a contract and does not encompass future dealings or negotiations between the parties"). By entering into the transactions with Nicotra and Colombo, defendant did not interfere with any of plaintiff's rights because plaintiff simply had no rights under the Loan or Pledge Agreement after the default. The terms of the Pledge Agreement did not require CNB, or the FDIC as receiver, to get Beninati's approval before selling the pledged shares. Beninati had the right to be notified that the shares would be sold. Upon a default the Pledge Agreement provided that CNB had the right to vote the shares, not Beninati. Therefore, Beninati had no right to vote on the proposed sale of the EYI note to Colombo.

Section 9–504(3) requires that the "[s]ale or other disposition [of collateral] may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." N.Y.U.C.C. § 9–504(3) (McKinney 1998). The statute also provides that "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale." *Id.*

The Pledge Agreement provides that CNB may have to resort to a private sale in the event of a default and that the parties agree that such private sales will be "deemed to have been made in a commercially reasonable manner." Section 9–504(3) may not be waived by the debtor. N.Y.U.C.C. § 9–501(3); *see also Bank of China v. Chan*, 937 F.2d 780 (2d Cir.1991). Parties may, nonetheless, agree in advance to what will be considered "reasonable"

provided that standard is not "manifestly unreasonable." N.Y.U.C.C. § 9–501(3).

The concept of "commercial reasonableness" is not explicitly defined by the UCC. Courts have construed the term to " 'mean that the qualifying disposition must be made in the good faith attempt to dispose of the collateral to the parties' mutual best advantage.' " *Federal Deposit Ins. Corp. v. Herald Square Fabrics Corp.*, 81 A.D.2d 168, 184–85, 439 N.Y.S.2d 944 (2d Dep't 1981) (quoting *Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 826, 368 N.Y.S.2d 268 (2d Dep't 1975)). Section 9–507(2) expressly provides that "the fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." N.Y.U.C.C. § 9–507(2) (McKinney 1998); *see also Sumner v. Extebank*, 88 A.D.2d 887, 888, 452 N.Y.S.2d 873 (1st Dep't 1982) (concluding that disposition of collateral was commercially reasonable despite the difference between the sale price and market value).

There are generally two approaches taken by courts in determining whether a sale of collateral was commercially reasonable. One line of cases holds that commercial reasonableness turns on the procedures employed to effect the sale. *See In re Zsa Zsa, Ltd.*, 352 F.Supp. 665, 671 (S.D.N.Y. 1972). The other line of cases holds that commercial reasonableness is demonstrated by the price obtained for the collateral. *See Mercantile Fin. Corp. v. Miller*, 292 F.Supp. 797 (E.D.Pa.1968). There is also some precedent indicating that both the procedures and the price should be considered. The Appellate Division, Second Department has noted that even in the face of "procedural propriety," a wide or marked discrepancy between the sale price and the market value requires strict scrutiny "especially where ... the possibilities for self dealing are substantial." *Herald Square Fabrics*, 81 A.D.2d at 185, 439 N.Y.S.2d 944.

With or without close scrutiny, the attendant circumstances of the sale of stock to Nicotra and the note to Colombo, which are essentially undisputed, demonstrate the reasonableness of the transaction. EYI was a closely held corporation. Certainly, it was foreseeable that a "public sale" would not be an option for the disposition of the pledged shares in the event of a default. The parties clearly contemplated the need for a private sale at the time the Pledge Agreement was signed. As evidenced by the default, EYI was having financial problems and by plaintiff's own admissions there were internal management conflicts. Plaintiff admits that he received notice of the default and of the fact that the FDIC would be accepting bids for the pledged stock.

The pledged stock was sold to Nicotra for $210,000. Plaintiff claims, without providing any support, that the stock was worth $3,000,000. Pl.'s Ans. to Interrogs. ¶ 2. Plaintiff claims that he would have offered more than $210,000 for the shares had he known that the FDIC was willing to sell the shares alone. Pl.'s Aff. in Opp'n to Summ.J. ¶ 5. The fact is, however, that plaintiff never made any such bid. Moreover, even if plaintiff had made a bid in excess of $210,000, the FDIC may have still chosen to enter into the transaction with Nicotra and Colombo. A secured creditor is " 'a lender, not an investor or a co-entrepreneur; it [has] the right to define and limit the risks it would accept.' " *Sumner*, 88 A.D.2d at 888, 452 N.Y.S.2d 873 (quoting *Bankers Trust Co. v. Dowler & Co.*, 47 N.Y.2d 128, 134, 417 N.Y.S.2d 47, 390 N.E.2d 766 (1979)). EYI owed the FDIC over $1,000,000 in interest and principal. EYI was experiencing financial and managerial troubles. At that point the likelihood that EYI would have ever repaid the note appeared doubtful. The FDIC decided to limit its risks by not only disposing of the collateral but by selling the ultimate risk, the note. The FDIC entered into a transaction with Nicotra that allowed it to dispose of the collateral and

the defaulted note for approximately the full amount of the principal and interest owed.

This action frames an unfortunate but all too common dispute among business partners no doubt prompted and flamed by financial failure. Plaintiff's attempt to hold the FDIC responsible for the unfortunate outcome cannot be sustained in law or fact. The FDIC had a right under the Pledge Agreement to dispose of the pledged stock in a private sale. EYI was a closely held corporation in financial distress. The ultimate purchaser of the collateral was bound to be an insider. The Pledge Agreement also contemplated that a private sale may not maximize the sale proceeds. Beninati's fellow shareholders' actions excluding him from participating in the affairs of EYI are not attributable to the FDIC. Moreover, after the default, Beninati no longer had any voting rights. Beninati's allegations that the FDIC purposefully structured the transaction to circumvent his rights under the Shareholders' Agreement is not reasonable. The Court concludes that the sale of the collateral was done in a commercially reasonable manner.

**D. Plaintiff's Motion to Amend the Complaint**

Plaintiff moves to amend its complaint to add the United States as a party. Plaintiff contends that if this Court concludes that its claims are tort claims it should be permitted to pursue the United States under the FTCA. Alternatively, plaintiff contends that even if his claims sound in contract, the Court should allow amendment of the complaint to add the United States as a party and to plead a claim under the Tucker Act. Recognizing that the Court of Claims would have exclusive jurisdiction over the Tucker Act claim, plaintiff requests that the Court transfer that portion of the action to the Court of Claims.

The Tucker Act provides that "district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims ... [over] [a]ny ... civil action or claim against the United States, not exceeding $10,000 in amount, founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). The Court expresses no opinion as to whether plaintiff would be able to maintain an action against the United States under the Tucker Act.

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend pleadings should be "freely granted when justice so requires." However, leave should not be granted where it would be futile. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *In re American Express Co.*, 39 F.3d 395, 402 (2d Cir.1994). In light of this Court's conclusion that defendant FDIC is entitled to judgment as a matter of law, amendment of the complaint would serve no purpose.

Plaintiff's motion to amend the complaint is denied. Defendant's motion to dismiss is granted.

The Clerk of the Court is directed to close this case.

SO ORDERED.