OPINION OF THE COURT
Fuchsberg, J.
We are here called upon to construe and apply subdivision (3) of section 9-504 of the Uniform Commercial Code, which provides that a secured party’s sale or other disposition of collateral upon its debtor’s default must be conducted in a "commercially reasonable” manner.
The case comes to us in the context of a dispute over the propriety of plaintiff Bankers Trust Company’s (Bankers) liquidation of municipal bonds held as collateral for loans made to a securities dealer, defendant J. V. Dowler & Company (Company), of which James V. Dowler, Jr. (Dowler), was president and principal stockholder. The basic issues are whether Bankers had adequate cause to "deem itself insecure”, a condition constituting a default under the parties’ security agreement, and whether Bankers’ response to that default was commercially reasonable in light of the standards prevailing in the municipal securities field. A final question is whether the conduct that led to the declaration of default was fraudulent.
As a dealer in municipal securities, the Company would buy and sell bonds for its own account. Its relationship with Bankers essentially was the usual one in which a banking institution makes loans keyed to the value of bonds a dealer puts up as collateral. Specifically, Bankers alleges that its understanding with the Company limited the sums it agreed *132 to advance to 90% of the current market value of the Company’s unsold bonds pledged with it and 100% of the sales price of bonds sold by the Company but held by Bankers, as clearing agent, for delivery to the purchaser.[1] The bank had the right to hold the Company’s bond inventory and the tickets evidencing the Company’s obligation to deliver bonds in exchange for their purchase price on specified settlement dates, all pursuant to a written security agreement which provided, in pertinent part, that the collateral could be sold whenever "the Bank deems itself insecure * * * or if it appears * * * that any representation in any financial or other statement of the [Company] * * * is untrue or omits any material fact”.[2]
Apparently, this debtor-creditor relationship was uneventful until May-June, 1974, when there was a precipitous downslide in the municipal bond market. During this period, Dowler presented Bankers with sales tickets for transactions in which over $2 million worth of municipal bonds were sold to the Franklin National Bank (Franklin) for delivery on July 16 and 18. After postponement of a settlement date caused Bankers to investigate these transactions, Dowler admitted not only that the ticket prices were above true market value, but that, unbeknownst to Bankers, he had simultaneously executed purchase tickets representing repurchases of the same bonds by the Company from Franklin at an identical price plus a small premium. This, Bankers alleges, was a "wash sale” which effected no true change in the beneficial ownership of the stock but misled it into advancing 100% on what it had assumed were tickets for bona fide, arms length *133 sales rather than the 90% of market value which was the outside limit of the credit it would extend on unsold bonds (see Ernst & Ernst v Hochfelder, 425 US 185, 205).
When Dowler failed to meet Bankers’ demand that he put up additional collateral roughly approximating the differential between the Company’s debit balance and the true value of the bonds and an attempt by Dowler to induce the Chase Manhattan Bank to share the risk on the Company’s loans proved futile, Bankers liquidated the Company’s securities. To accomplish the liquidation, after giving the Company notice and an opportunity to redeem, the bank’s municipal bonds department solicited bids, receiving 6 on 2 of the issues "sold” to Franklin, 10 on a third, and one each on the remaining 2. This action to recover a $374,000 deficiency on the sale of collateral approximating $3.5 million followed.
For the purposes of this appeal, we need concern ourselves with but two of the four causes of action spelled out in Bankers’ complaint.[3] One was asserted against the Company alone to recover the deficiency. The second was against both the Company and Dowler individually for fraud in connection with the Franklin transactions. Special Term, expressing the opinion that whether Bankers acted in-a "commercially reasonable manner” presented a question of fact, denied cross motions for summary judgment. However, on cross appeals, the Appellate Division held Bankers’ conduct reasonable as a matter of law, entered an order granting its motion, and directed judgment in its favor on all causes of action (62 AD2d 778). For the reasons which follow, we agree with that disposition.
Initially, we observe that there can be no serious question but that Bankers was entitled to exercise its default remedies. The broad language of the security agreement permitted it to move to protect its interests whenever it deemed itself insecure or was confronted with a passive or active misrepresentation by its debtor. Dowler’s blunt admission that he had engaged in wash sales to postpone the effect of the losses occasioned by the declining market was ample cause for *134 insecurity. The bank was a lender, not an investor or coentrepreneur; it had the right to define and limit the risks it would accept. Each time Dowler submitted one of the Franklin sales tickets to Bankers, it at least impliedly misrepresented that the underlying transaction was fairly described. Instead, viewed most favorably, it was only a half truth; it was silent on the repurchase which in effect canceled out the sale. Such an omission concealed the very kind of danger against which the bank had a right to, and did, protect itself by exacting the terms in its security agreement.
The Uniform Commercial Code contains no definition of default. Nor does it have any provision forbidding the parties from agreeing that circumstances such as those we have described would trigger the bank’s right to liquidate the security. Accordingly, the agreement is controlling for this litigation (see Hogan, The Secured Party and Default Proceedings Under the UCC, 47 Minn L Rev 205, 209; cf. Uniform Commercial Code, § 9-501, subd [3]).
As to Bankers’ postdefault actions, the touchstone of its obligations as a secured party was to dispose of the collateral in a "commercially reasonable” manner (Uniform Commercial Code, §§ 9-207, 9-502, subd [2]).[4] Though commercial reasonableness must inhere in "every aspect of the disposition including the method, manner, time, place and terms” (Uniform Commercial Code, § 9-504, subd [3]), the virtue of its lack of further particularization is that it invites consideration of accepted business practices as a guide to what is most likely to protect both debtor and creditor (Commercial Law, 1978 Ann Survey Am L, 113, 115). Customs and usages that actually govern the members of a business calling day-in and day-out not only provide a creditor with standards that are well recognized, but tend to reflect a practical wisdom born of accumulated experience. This is especially so here where we do not deal with a lay borrower enmeshed in a contract of adhesion but with two sophisticates who vocationally traffic in the milieu of high finance (see Clark, Default, Repossession, Foreclosure, and Deficiency: A Journey into the Underworld and a Proposed Salvation, 51 Ore L Rev 302, 312-315).
These considerations in mind, we focus now on the factors *135 enumerated in section 9-504. In this connection, some authorities suggest that optimizing resale price is the prime objective of the code’s default mechanisms and that the other factors listed are merely designed to ensure that the highest price is achieved (Mercantile Fin. Corp. v Miller, 292 F Supp 797; White & Summers, Uniform Commercial Code, § 26-11, pp 987-989; Gilmore, Article 9 of the Uniform Commercial Code— Part V: Default, 7 Personal Fin LQ Rep 4, 7, 9). Others would have commercial reasonableness turn on the procedures employed (Matter of Zsa Zsa, Ltd., 352 F Supp 665, 671, affd mem 475 F2d 1393; cf. Uniform Commercial Code, § 9-507, subd [2] ["(t)he fact that a better price could have been obtained * * * is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner”]). Examination of the record here reveals that Bankers’ conduct survives either test.
As to the "terms” of the liquidation, though the bonds were sold below both their face value and the amount entered on the Franklin sales tickets, the appellants do not argue that the proceeds were below the actual market value on the date of sale, and they admit that the Franklin "price” was inflated. Though the prices for which the bonds were sold averaged more than 10% lower than those at which they were purchased, this is not surprising in light of the sharp drop in the published bond indexes for July, 1974 (see Standard & Poor’s Statistical Service, Security Price Index Record for 1978, p 235).
As to the "method”, the securities held by Bankers were apparently of a type customarily sold on a recognized market (see Kripke, Practice Commentary, McKinney’s Cons Laws of NY, Book 63i/2, pt 3, UCC 9-504:2, p 611; Hudak & Turnbull, The Standard of Commercial Reasonableness in the Sale of Repossessed Collateral Under the UCC, 4 Western St U L Rev 22; 29-30). Thus, Bankers’ sale of the bonds through regular market channels is immune to attack on the grounds of commercial unreasonableness, irrespective of whether it be deemed public or private (see Hogan, 47 Minn L Rev, 205, 226-227). And, it is by now established that the fact that two of the bond issues drew only one bid does not, without more, render their sale unreasonable (see Matter of Zsa Zsa, Ltd., 352 F Supp 665, supra). When the sale is conducted so as to give a sufficiently broad group of buyers the opportunity to bid, their failure to respond in any particular number may *136 itself be an indication of the market value of the item offered for sale.
But, despite a failure to deny that the method of liquidation pursued by the bank was the customary one, the Company and Dowler take the position that Bankers nevertheless should have presented the bonds to Franklin, which presumably had undertaken an obligation to pay the full price entered on the open sales tickets. In this way, Dowler contends, no deficiency would have arisen despite the depressed state of the market. However, to require Bankers, which had elected to declare the default on or about July 1, to await payment from Franklin would be to compel it to rely on the credit of a third party for approximately two and a half more weeks until July 16 and 18, a long period in terms of the highly unsteady market conditions that prevailed at the time. Moreover, during this interval, the defendants would have Bankers defer pursuing the Company, which, as discovery of the wash sales had revealed, was exposed to financial straits which well might worsen with each passing day. Dowler’s resort to the wash sale device also presented a possibility (later revealed to be a fact) that Franklin never contemplated that it would have to pay for the bonds and was merely expecting a check for its premium in settlement of the matching transactions, a circumstance which could have been anticipated to lead to Bankers’ acquisition of a lawsuit instead of its money.
In short, though Bankers’ indulgence would have accommodated Dowler’s hope that the bond market might recover in time, Bankers had a right to perceive such tolerance as contrary to its legitimate self-interest. Certainly the code was not intended to place a secured party at a borrower’s mercy by permitting it to speculate with pledged collateral at will. Indeed, since a secured party need not fall back upon his debtor’s recommendations in order to satisfy his duty of reasonable care, Bankers certainly need not have done so when the grave threat of further depreciation of the bonds dictated a more prudent course of action (see Old Colony Trust Co. v Penrose Inds. Corp., 280 F Supp 698, 717, affd 398 F2d 310). In addition, by proceeding in normal course, the bank was able to dispose of its holdings before the market dropped even lower and thereby avoid the accusation that delay itself tainted the sale (see Harris v Bower, 266 Md 579). Given these circumstances, it is hard to see how it can be said that *137 Bankers’ refusal to wait to sell the bonds to Franklin rendered its actions commercially unreasonable.
In sum, after eliminating conclusory and irrelevant allegations, the undisputed facts and irrefutable documentary evidence bearing upon each of the elements of commercial reasonableness make it manifest that there could be no realistic expectation that the Company would succeed in obtaining a factual or legal determination in its favor. We therefore affirm the Appellate Division’s order insofar as it granted Bankers summary judgment on this issue (see Rotuba Extruders v Ceppos, 46 NY2d 223, 231).
Finally, the record demonstrates that the conduct which gives conclusive support to Bankers’ declaration of default constitutes fraud as well, and, since the Company acted entirely through Dowler, he is liable on that count along with it.[5] It is undeniable that when he presented the tickets for the sales to Bankers, Dowler permitted their surface expressions to leave the impression that they represented unconditional sales. Though he knew they did not, he concededly failed to disclose that he had already agreed to repurchase the bonds. Entries on the purchase tickets he held reading "Special Instructions — Settle by Difference Check”[6] constitute incontrovertible evidence in writing of a contemporary intention and expectation that the bonds would never have to be accepted by Franklin. The purchase tickets and their entries first came to light when the Federal Deposit Insurance Company, as receiver in bankruptcy for Franklin, made them available upon discovery.
That the implied representations of authenticity were intended to be acted upon by Bankers is obvious, Dowler having testified at his examination before trial that, because he was in a "bind”, he was seeking to "buy time” while gambling that the market would come back. Furthermore, he used the tickets as a basis for circumventing the agreement with Bankers by obtaining 100% of the full, above-market price for which they had been written, thus leaving no doubt either as *138 to the materiality of the representations or as to Bankers’ reliance thereon.
In sum, the facts encompassed the classic elements of false representation, scienter, materiality, expectation of reliance and damage that go to make up fraud (see, generally, Prosser, Torts, ch 18). Consequently, whatever post hoc excuses and rationalizations Dowler was later to offer for his behavior, they did not serve to create an issue of fact sufficient to resist summary judgment on this score either.
For these reasons, the Appellate Division order should be affirmed, with costs.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones and Wachtler concur with Judge Fuchsberg.
Order affirmed.

. Although Dowler denies that these were the terms of the oral agreement, he has admitted that Bankers would lend him the face amount of any sales tickets he presented. Different treatment of the two categories of bonds is evidenced by the undisputed fact that at no time did Bankers allow the loans to reach 100% of the value of all bonds held as collateral.

. This agreement also provided that in the event of default, "(a) all liabilities of the undersigned shall become at once due and payable, without notice, presentment or demand of payment, which are hereby expressly waived, (b) the Bank shall have the right, from time to time, without advertisement or demand upon or notice to the undersigned or right of redemption by the undersigned except as shall be required by applicable statute and cannot be waived, at its option to sell, re-sell, assign, transfer and deliver all or any part of the Collateral, at any brokers’ board or exchange or at public or private sale, for cash or on credit or for future delivery * * * Upon each such sale, the Bank, unless prohibited by provision of any applicable statute which cannot be waived, may purchase all or any part of the Collateral being sold, free from and discharged of all trusts, claims, right of redemption and equities of the undersigned.”

. Bankers also sought to recover $16,257.19 representing an overdraft in the Company’s checking account, but defendants do not -dispute their liability for this sum on appeal. Also named as a party defendant was the Federal Deposit Insurance Company, the receiver in bankruptcy of the now defunct Franklin National Bank. The Appellate Division awarded judgment against the FDIC on what it found was Franklin’s complicity in the wash sales, but the FDIC has not appealed.

. In New York this broadly stated standard of conduct evolved long before our adoption of the Uniform Commercial Code in 1964 (see Matter of Kiamie, 309 NY 325).

. The Appellate Division order awards judgment against Dowler as an individual for the amount of the deficiency on the bonds involved in the Franklin transactions. The Company was also held liable for this amount as well as for the deficiency attributable to the other items Bankers held as collateral.

. A transaction is settled by a difference check in lieu of going through the motions of actually delivering and receiving securities on a transaction that originates and ends with the same party.