JOHN DEERE INDUSTRIAL
EQUIPMENT COMPANY,
Plaintiff,

v.

TRIPLE CITIES EQUIPMENT, INC.,
Carl L. Hughes, and Linda L.
Hughes, Defendants.

84–CV–819.

United States District Court,
N.D. New York.

Sept. 30, 1986.

Costello, Cooney & Fearon, Syracuse, N.Y., for plaintiff; Vincent A. O'Neil, of counsel.

Butler & Allen, Vestal, N.Y., for defendants; Earl D. Butler, of counsel.

McAVOY, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On June 17 through 18, 1986, a bench trial was held in the above-captioned matter. On the basis of the evidence adduced at that trial as well as the applicable law, the Court, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, makes the following findings of fact and conclusions of law:[1]

### FINDINGS OF FACT

1. Plaintiff, John Deere Industrial Equipment Company ("John Deere"), is a Delaware corporation with its principal place of business in Moline, Illinois.

2. Defendant, Triple Cities Equipment, Inc. ("TCE"), is a New York corporation with its principal place of business in Vestal, New York.

3. Defendant Carl J. Hughes, a resident of the State of New York, was at all times relevant to this action, the President of TCE.

4. Defendant Linda L. Hughes, a resident of the State of New York, was at all times relevant to this action, an officer of TCE.

5. In late 1966 and early 1967, John Deere and TCE entered into a series of agreements whereby TCE became a franchisee of John Deere and agreed to buy from John Deere certain machinery and equipment for resale to retail customers. *See* Plaintiff's Exhibits 1 through 8.

6. On July 31, 1967, defendants Carl J. Hughes and Linda L. Hughes signed an agreement whereby they personally guaranteed all of the obligations of TCE to John Deere. *See* Plaintiff's Exhibit 30.

7. This guarantee and the agreements between TCE and John Deere were in full force and effect at all times relevant to this action.

8. In November and December of 1982, TCE sold several pieces of equipment to retail customers and failed to remit payment for those items to John Deere as required by the parties' agreement.

9. In April 1983, TCE's check, submitted as payment of amounts due and owing from TCE to John Deere under their agreement, was dishonored. Soon thereafter, the check was paid.

10. During the second week of May 1983, George DeClue, a John Deere representative, discovered during his monthly inventory check that several pieces of TCE's equipment were out of inventory. In light of this, DeClue demanded payment from TCE of the amounts due and owing for the equipment.

11. Several days later, on May 16, 1983, Declue returned to TCE with Leo Holland, another John Deere representative. On that date, Carl Hughes indicated that additional pieces of TCE's equipment were out of inventory. On the basis of these further representations, DeClue and Holland demanded payment from TCE of $237,054.19, the amount due and owing for the equipment out of inventory. When TCE failed to remit payment by May 17, 1983, John Deere terminated the dealership contract and demanded payment of the entire balance of TCE's account. *See* Plaintiff's Exhibit 22.

12. In order to insure payment from TCE, John Deere immediately took possession of TCE's inventory and moved it to another location. Pursuant to the terms of its agreement with TCE, John Deere sold TCE's complete new machines to other dealers and credited TCE's account with the amounts derived from these sales. *See* Plaintiff's Exhibit 6, ¶ 11. With TCE's consent, John Deere also repurchased resalable parts from TCE's inventory and after an inventory of the parts, TCE's account

---

**1.** To the extent that the Court's findings of fact include conclusions of law and its conclusions of law include findings of fact, such findings and conclusions are incorporated by reference into one another.

was credited for the parts. *See* Plaintiff's Exhibits 14 and 58.

13. By letter dated June 13, 1983, John Deere informed TCE that a public auction for the sale of TCE's remaining collateral, which consisted of used goods and attachments and parts that could not be resold at retail, had been scheduled for June 29, 1983. The letter also indicated that TCE had a right to redeem its collateral prior to the auction by tendering payment of all amounts still due and owing to John Deere, the amount of which would be provided to TCE upon request. *See* Plaintiff's Exhibit 23.

14. By letter dated June 21, 1983, TCE's counsel requested a specific redemption price from John Deere. *See* Plaintiff's Exhibit 24. When TCE was provided only with a redemption price range of between $199,000 and $210,000, *see* Plaintiff's Exhibit 25, it requested that the June 29 auction be postponed until such time as John Deere could provide a specific redemption price and an itemized account detailing how the price was determined. *See* Plaintiff's Exhibit 26. John Deere was unable to provide a specific redemption price at that time because it had not completed its inventory of the plaintiff's resalable parts.

15. Eventually, the inventory was completed and TCE's account was credited for the resalable parts. *See* Plaintiff's Exhibit 14. By letter dated October 6, 1983, John Deere's counsel informed TCE that its total net indebtedness to John Deere was $249,-697.54. *See* Plaintiff's Exhibit 39. At no time prior to or after that letter did TCE attempt to redeem its collateral. Instead, it agreed to an auction date of November 18, 1983. *See* Plaintiff's Exhibit 38.

16. The auction was conducted by a professional auctioneer at TCE's place of business. Prior to the auction, John Deere notified heavy equipment dealers across the Eastern United States, including its own dealers, of the pendency of the sale. The sale was well publicized, *see* Plaintiff's Exhibits 52 through 54, and well attended. The defendants' only complaint concerning the sale was that the sale was conducted too late in the construction season because of John Deere's delay in providing a redemption price.

17. After the sale, TCE's account was credited with the net proceeds of the sale. *See* Plaintiff's Exhibit 55. By letter dated February 28, 1984, John Deere informed TCE that there remained a deficiency of $140,790.63 due and owing from TCE to John Deere. *See* Plaintiff's Exhibit 28. In the letter, John Deere also demanded payment of the deficiency.

18. Despite this demand, the defendants refused to pay because they contested the accuracy of John Deere's figures. *See* Plaintiff's Exhibits 34 and 36. As a result, John Deere commenced this action on June 13, 1984. After commencement of this action, John Deere discovered an error in its calculations of interest on the plaintiff's account and reduced the amount sought in this action to $128,430.68 plus interest from June 12, 1984.

19. After the loss of its inventory, TCE went out of business and the Hughes sustained additional financial losses, including the loss of the buildings which housed the dealership.

## CONCLUSIONS OF LAW

1. Jurisdiction herein is predicated upon diversity of citizenship. 28 U.S.C. § 1332(a).

2. TCE's failure in late 1982 and early 1983 to remit payment to John Deere of funds derived from the sale of equipment constituted a breach of the parties' dealership agreement.

3. Upon TCE's breach, John Deere lawfully exercised its right to terminate the dealership agreement.

4. The defendants' contention that John Deere had previously waived its right to terminate the dealership is without merit. The defendants presented no evidence whatsoever that John Deere, at any time, knowingly permitted TCE to sell equipment without immediately remitting payment to John Deere as required by the parties'

agreement. John Deere had no knowledge that TCE was selling equipment out of trust until May 1983. In the absence of such knowledge, there can be no waiver of TCE's breach.

5. Under the terms of its Security Agreement, Plaintiff's Exhibit 6, John Deere also had the right to take possession of and resell TCE's inventory to protect its security interest in the inventory. On May 18, 1983, John Deere lawfully took possession of TCE's inventory.

6. Prior to disposing of TCE's inventory, however, John Deere was required by U.C.C. § 9–506 to provide TCE with an opportunity to redeem its inventory by paying all amounts secured by the collateral. The defendants maintain that their right of redemption was frustrated by John Deere's failure to provide a specific redemption price within a reasonable time after repossession. The Court disagrees.

7. Under the circumstances of this case, John Deere provided the defendants with the best information that it had available at the time it was requested. In June 1983, prior to completion of the inventory of TCE's resalable parts, John Deere provided a redemption range. In September, after completion of the inventory, a more specific figure was provided. The delay occasioned by the inventory was not an unreasonable one given the magnitude of the inventory. Under these circumstances, it cannot be said that John Deere's actions frustrated the defendants' right of redemption if in fact the defendants had the means to exercise that right.

8. Once the defendants waived their right of redemption, it was incumbent upon John Deere to dispose of TCE's inventory in a commercially reasonable manner. U.C.C. § 9–504. In this regard, it is undisputed that the sale of TCE's inventory was properly advertised and conducted. The defendants argue, however, that because of John Deere's delay in completing its inventory of TCE's resalable parts the sale was held after the peak of the construction season and brought in less money than it would have if it had been conducted earlier in the year.

9. The Court of Appeals of the State of New York has endorsed two separate tests for determining the commercial reasonableness of a forced sale: the procedures test and the proceeds test. *See Bankers Trust Co. v. Dowler & Co.*, 47 N.Y.2d 128, 417 N.Y.S.2d 47, 390 N.E.2d 766 (1979). It is clear in the present case that the procedures test, which focuses on the procedures employed prior to and during the sale, has been satisfied. The delay in conducting the sale was not of sufficient duration to constitute an unreasonable delay. Moreover, the sale of the goods in November, a supposedly slow month, was preferable to holding the inventory until the following construction season. Accordingly, in terms of the procedural aspect of the sale, John Deere has satisfied its obligation under the U.C.C.

10. The Court is also convinced that John Deere has satisfied its obligation under the proceeds test. Under that standard, the secured party is required to act in a manner designed to maximize the price achieved at the sale of the repossessed goods. This does not mean, however, that a secured party must subordinate its security to the debtor's interest. On the contrary, the secured party is entitled to protect its interest provided its actions do not unreasonably limit the return on the sale of the debtor's collateral.

11. In this case, the sale of TCE's inventory was delayed as a result of the inventory of TCE's resalable parts. That inventory had to be completed in order to provide the defendants with a more accurate redemption price. Thus, it was in the best interests of both parties that the inventory be completed prior to a sale. As noted previously, the delay was not unreasonable in and of itself. Once the inventory was complete, the sale of TCE's collateral was conducted as expeditiously as possible. Under the circumstances of this case, this is all that John Deere could do to

**118**

insure the highest price for TCE's inventory.

12. As guarantors of the obligations of TCE, defendants Carl and Linda Hughes are personally liable for all amounts due and owing from TCE to John Deere.

13. None of the losses incurred by the defendants subsequent to the termination of the dealership by John Deere were the result of any unauthorized actions by John Deere.

WHEREFORE it is hereby

ORDERED that judgment be entered in favor of the plaintiff as against the defendants in the amount of $128,430.68 plus interest from June 12, 1984.

IT IS SO ORDERED.