# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 8, 2014

Lyle W. Cayce
Clerk

No. 13-50335

In the Matter of:  ADOBE TRUCKING, INCORPORATED,

Debtor

--------------------------------------------------------

ADOBE TRUCKING, INCORPORATED;
ADOBE DRILLING SERVICES, LIMITED,

Appellants

v.

PNC BANK, NATIONAL ASSOCIATION, PAUL FRANK, VICE PRESIDENT; M&I BUSINESS CREDIT, LLC, CT CORP SYSTEM, SERVICE AGENT; LAND HOLDING, LLC; PAUL FRANK,

Appellees

Appeals from the United States District Court for
the Western District of Texas
USDC No. 7:12-CV-031

Before BARKSDALE, PRADO, and HAYNES, Circuit Judges.

PER CURIAM:*

Adobe Trucking, Inc. (ATI) filed for Chapter 11 bankruptcy on 23 November 2010, after which this adversary proceeding was removed from state

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-50335

court. The bankruptcy court ruled in favor of PNC Bank (PNC). ATI and Adobe Drilling Services, Ltd. (ADS) (collectively, Appellants) appealed to the district court, which affirmed.

Appellants claim: the bankruptcy court erred in ruling (1) there was a consummated foreclosure sale; (2) the parties' agreement was not manifestly unreasonable; (3) PNC's actions regarding the sale were commercially reasonable; (4) there was no fraudulent transfer; and (5) PNC owed no fiduciary duty to Appellants. (Concerning several issues, they assert also that the bankruptcy court failed to comply with Federal Rule of Civil Procedure 52(a)(1) (requiring court acting as trier of fact to state fact-findings and legal conclusions separately)). AFFIRMED, essentially for the reasons stated by the bankruptcy and district courts.

I.

In December 2006, Appellants entered into a revolving credit and security agreement (the agreement) for a $37.5 million, five-year revolving-credit facility with various financial institutions, including PNC, which would serve as the lead bank and agent for all the lenders. The agreement provided New York law would govern, and that, *inter alia*, upon Appellants' default, PNC could exercise the right to foreclosure of the security interests granted. In that regard, PNC could take possession of the collateral and sell it without judicial process. Further, the collateral could be sold "at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery" as PNC could elect, regardless of whether it possessed the collateral.

The same day the parties entered into the agreement, PNC obtained landlord waiver agreements from Adobe Oilfield Services (AOS), Adobe Ironworks (AI), and Mesquite Bean (Mesquite) (sister entities with control over the premises on which collateral was located). Despite Appellants' failure to

2

No. 13-50335

abide by the terms of the agreement, the parties amended it on two occasions: in March 2007, increasing the available credit to $43 million; and, that July, increasing it to $47.5 million.

Shortly after the second amendment, Appellants' capital expenditures for the 2007 fiscal year exceeded the specified limit. Appellants continued to default in other ways; for instance, they failed to achieve the minimum rig-fleet inventory utilization rate. On several occasions, PNC gave Appellants notice of default under the agreement.

During the first half of 2008, oil prices steadily rose to a high of $145 per barrel, leading to a high demand for drilling rigs. By January 2009, however, the prices had dropped to a low of $35 per barrel. As a result, by the fall of 2008, Appellants elected to suspend most drilling operations.

As of early December 2008, with Appellants still in default under the agreement, PNC (and the other lenders) chose to exercise their default remedies. On 23 December 2008, PNC provided Appellants with its first written request that Appellants immediately relinquish possession and control of the collateral, and that they provide a list of locations of all their assets. Appellants neither acknowledged nor complied with this request. By 31 December 2008, PNC provided Appellants with a foreclosure notice, stating the public foreclosure sale of the collateral would occur at 11:00 a.m. on 16 January 2009.

PNC subsequently provided Appellants with multiple written requests for possession of the collateral, to no avail. For example, in a 14 January 2009 letter from PNC to Appellants, they were requested, *inter alia*, to "cooperate with PNC to make the collateral available . . . and to provide information regarding [its] location and status". Appellants responded by asserting PNC was given possession of eight rigs during a December 2008 meeting, but PNC claims it never received possession. Appellants also offered to move the rigs to

3

No. 13-50335

a location of PNC's choice for 80% costs (an offer PNC rejected) and otherwise declined to cooperate.

On 6 January 2009, PNC placed a notice of sale in *The Dallas Morning News*, the *Odessa American*, and the *Midland Reporter-Telegram* (and on their respective websites). The notice provided: PNC would conduct a public sale to the highest qualified bidder for the collateral; the date, time, and place at which the sale would occur; PNC reserved the right to credit bid and purchase the collateral; and a detailed description of the collateral.

Although not in possession of the collateral, PNC foreclosed on 16 January 2009 as scheduled. Fifty minutes before foreclosure, AOS and AI filed a state-court action against Appellants and PNC, claiming liens on the collateral. Two bids were made at the foreclosure sale: a $1 million opening bid, and PNC's winning $41 million credit bid. One hour after the sale, Appellants filed a cross-claim against PNC. That same day, PNC transferred all of its interest in the collateral to an affiliate, with PNC authorized to take possession of the collateral. PNC advised AOS, AI, and Mesquite of its intent to remove the collateral from their premises, but all responses suggested they would not permit removal.

In March 2009, after finding PNC was continually and wrongfully refused access to the collateral, a state court enjoined AOS, AI, and Mesquite from interfering with, or preventing, PNC from removing the collateral. After it was removed, PNC held an auction—through another entity—on 29-30 April 2009, attended by hundreds of bidders. Although the collateral had been prepared for auction, most of it could not be sold. The auction netted only approximately $10 million.

After ATI filed for bankruptcy on 23 November 2010, this adversary proceeding was removed from state court. Appellants raised several issues before the bankruptcy court, including whether: the agreement was manifestly

4

No. 13-50335

unreasonable; the foreclosure sale was commercially reasonable under the proceeds and procedures tests; there was a fraudulent transfer for less than reasonably equivalent value; there were damages for the loss of any surplus; there was a breach of a fiduciary duty or misappropriation of fiduciary property; there was a contract for, charge, or receipt of usurious interest; and there was fraud, conversion, or theft. *In re Adobe Trucking, Inc.*, No. 10-70353, 2011 WL 6258233, at *10-14 (Bankr. W.D. Tex. 15 Dec. 2011).

In its opinion, the bankruptcy court first set out the secured parties' rights to dispose of collateral after default under Article 9 of the Uniform Commercial Code and New York law. *Id.* at *4. The court noted the term "commercially reasonable" lacks a uniform definition, but explained the purpose of the U.C.C.'s provisions requiring a commercially reasonable sale is "to produce the highest price possible for the collateral" (although price is not the sole factor). *Id.* Ultimately, "the inquiry into commercial reasonableness is a fact-intensive one that requires an examination of all circumstances of the liquidation", with the secured party carrying the burden of proof as to the commercial reasonableness for each aspect of the disposition. *Id.* at *5 (citations omitted).

The bankruptcy court noted New York courts have adopted both the proceeds and procedures tests to evaluate the commercial reasonableness of a sale. *Id.* at *8. Under the former, such reasonableness is based solely on the difference between the price received at the foreclosure sale and the price the collateral previously sold for, or whatever the court determines is the collateral's fair-market value. *Id.* at *5. Under the latter, the focus is "on how the sale was conducted and the efforts made by the creditor to achieve the best price". *Id.* at *7.

The bankruptcy court also considered the effect of credit agreements on a sale's commercial reasonableness. *Id.* at *9-10. Along this line, although

5

parties may not waive the requirement of a commercially-reasonable disposition of collateral, U.C.C. § 9-603 expressly permits "parties [to] determine by agreement the standards measuring the fulfillment of the rights of a debtor . . . and the duties of a secured party", as long as those "standards are not manifestly unreasonable". *Id.* at *9 (quoting N.Y. U.C.C. § 9-603) (internal quotation marks omitted). If a credit agreement exists between parties, the agreement is not manifestly unreasonable, and a subsequent foreclosure sale is conducted in accordance with that agreement, then the foreclosure sale is likely commercially reasonable. *See id.* at *9-10.

When considering whether the agreement was manifestly unreasonable, the bankruptcy court explained that the U.C.C.'s restrictions on parties' abilities "to define what is commercially reasonable", are meant "to prohibit agreements [that relieve] secured creditors 'from virtually all responsibility with respect to the collateral'". *Id.* at *9 (quoting *Orix Credit Alliance, Inc. v. East End Dev. Corp.*, 688 N.Y.S.2d 191, 192 (2d Dep't 1999)). The bankruptcy court found: "The . . . [a]greement provided reasonable standards for the foreclosure process, but did not purport to waive the rights of [Appellants] under the [U.C.C.]". *Id.* at *10. Thus, the agreement was ruled not manifestly unreasonable. *Id.* at *14.

Next, considering the commercial reasonableness under the proceeds test, the bankruptcy court noted that "[p]roperty offered at a foreclosure sale frequently produces a price substantially less than market value" and that New York courts consistently decline to "disturb a foreclosure sale . . . except . . . where the price alone is so inadequate as to shock the court's conscience". *Id.* at *11 (citations omitted). Upon considering the evidence presented during the five-day trial, the bankruptcy court accepted the $33.85 million value advanced by PNC, but also suggested, that, even if it accepted Appellants' estimated value, the $41 million credit bid would still be 67% of the alleged

value of the collateral. *Id.* at *11, *14. Therefore, the sale was ruled commercially reasonable under the proceeds test. *Id.*

When considering whether the sale was commercially reasonable under the procedures test, the bankruptcy court discussed three claims by Appellants: (1) PNC did not prepare the collateral for sale, nor did PNC give prospective buyers an opportunity to inspect it; (2) a higher price could have been obtained if PNC had delayed the sale or sold the collateral in a different manner; and (3) only two prospective buyers attended the sale. *Id.* at *12-13.

The bankruptcy court noted that Appellants, in violation of the agreement, prevented PNC from taking possession of the collateral prior to the sale. *Id.* at *12. Moreover, under the agreement, Appellants agreed it would be commercially reasonable "to fail to incur expenses reasonably deemed significant by [PNC] to prepare [the collateral] for disposition", and that PNC was authorized to sell the collateral, in the event of default, with or without possession of the collateral at the time or place of the sale. *Id.* at *12-13 (internal quotation marks omitted). Additionally, New York law permits secured parties to dispose of collateral "in its present condition or following any commercially reasonable preparation or processing". *Id.* at *12 (citing N.Y. U.C.C. § 9-610). The bankruptcy court also found that "[w]here a debtor denies the secured party access to the collateral, it cannot complain about the commercial reasonableness of not making the collateral available". *Id.* at *13 (citing *Cantrade Private Bank Lausanne Ltd. v. Torresy*, 876 F. Supp. 564, 569 (S.D.N.Y. 1995)).

As to Appellants' final claims regarding the commercial reasonableness of the sale under the procedures test, the bankruptcy court determined PNC was under no obligation to delay it, because the agreement tracked New York law (permitting the sale of collateral at public or private sale, at any time or place). *Id.* And, finally, the bankruptcy court determined: "The fact that a

No. 13-50335

disposition of collateral draws only one or a small number of bids does not, without more, render a sale unreasonable". *Id.* (citing *Bankers Trust Co. v. J.V. Dowler & Co., Inc.*, 390 N.E.2d 766, 770 (N.Y. 1979)). Thus, the sale was ruled commercially reasonable under the procedures test. *Id.* at *14.

Based on the foregoing rulings, the bankruptcy court concluded, "[f]or similar reasons", there was: no fraudulent transfer for less than reasonably equivalent value; no damages for loss of any surplus; no fiduciary duty and, therefore, no breach of fiduciary duty nor any misappropriation of fiduciary property; no contract for, charge, or receipt of usurious interest; and, no fraud, conversion, or theft. *Id.*

Appellants appealed to district court, making essentially the same claims as are presented to this court. *See Adobe Drilling Servs., Ltd. v. PNC Bank, N.A.*, No. MO-12-CA-31, mem. op. (W.D. Tex. 11 Mar. 2013). Appellants claimed the sale was not commercially reasonable under the proceeds test because the collateral was worth approximately $81 million, rather than PNC's $41 million credit bid and ultimate sale price. *Id.* at *8.

The district court explained the $81 million valuation was based on an appraisal from 2008 and so had to be discounted. *Id.* at *8-9. The district court ruled that, even if the bankruptcy court had determined the collateral was worth $81 million, the $41 million credit bid and sale price would still have been reasonable because it exceeded 50% of the $81 million, an amount that did not "shock the court's conscience". *Id.* at *9 (citing, *inter alia*, *DeRosa v. Chase Manhattan Mortg. Corp.*, 782 N.Y.S.2d 5, 9-10 (1st Dep't 2009) (upholding sale for 45% of market value)). Therefore, the district court ruled the bankruptcy court did not err in finding the foreclosure sale was commercially reasonable under the proceeds test. *Id.* at *9-10.

Next, the district court considered Appellants' contention that the bankruptcy court erred in holding the foreclosure sale was commercially

8

reasonable under the procedures test. *Id.* at *10. The district court determined the bankruptcy court, despite Appellants' claims, concluded PNC's alleged failure to prepare the collateral for sale was excused by Appellants' denying PNC access to it. *Id.* at *10. Moreover, as the bankruptcy court had noted, neither the agreement nor New York law required PNC to prepare the collateral before foreclosure. *Id.* The district court explained that, under New York law, the fact a greater selling price could have been obtained at a different time or by using different methods was not dispositive on whether a sale was commercially reasonable. *Id.* at *11.

According to the district court, the bankruptcy court found that: under the agreement, the collateral could be sold at either a public or private sale and at any time or place, and could be advertised in publications or media of general circulation; and, New York law does not require a seller to advertise a foreclosure sale in any specific type of media or for a specific amount of time. *Id.* The district court ruled that, because the sale complied with the agreement and New York law, the bankruptcy court did not err in holding the sale was commercially reasonable under the procedures test. *Id.*

The district court also considered Appellants' claim that the bankruptcy court erred in finding the agreement was not manifestly unreasonable. *Id.* at *12-13. Appellants took issue with two subsections: § 11.1(a), permitting PNC to sell the collateral without its possession, at one or more private or public sales, at any time or place, and at such price(s) and upon such terms for cash, credit, or future delivery as PNC may elect; and § 11.1(b), allowing certain actions in connection with the sale that would not be considered commercially reasonable if the parties had not agreed otherwise. *Id.* at *12. Accordingly, Appellants claimed they essentially waived their right to a commercially reasonable sale through these two subsections. *Id.* The district court concluded the bankruptcy court disagreed because "[i]t held that[,] to be

No. 13-50335

'manifestly unreasonable,' a credit agreement must relieve creditors 'from virtually all responsibility with respect to the collateral'". *Id.* at \*12-13 (quoting *East End Dev. Corp.*, 688 N.Y.S.2d at 192 (citation omitted)). Furthermore, although the specified subsections gave PNC broad authority and allowed certain actions regarding the sale that otherwise would have been unreasonable, neither subsection waived the requirement of a commercially reasonable disposition of the collateral entirely. *Id.* at \*13. Thus, the district court ruled the bankruptcy court did not err in holding the agreement was not manifestly unreasonable. *Id.*

The final issues raised by Appellants and considered by the district court were whether the bankruptcy court failed to make sufficient findings of fact and conclusions of law to support ruling that there was no fraudulent transfer for less than reasonably equivalent value and that PNC did not owe a fiduciary duty to Appellants. *Id.* Noting the bankruptcy court issued a 24-page opinion containing findings of facts and conclusions of law, *id.* at \*14, the district court ruled: the bankruptcy court's holding that there was no fraudulent transfer for less than reasonably equivalent value was supported by its determining the sale was commercially reasonable, *id.*; and the rulings were sufficient as to Appellants' fiduciary claims because, under New York law, the relationship between a debtor and creditor is not fiduciary in nature, *id.* at \*14-15 (citing *Schroeder v. Capital One Fin. Corp.*, 665 F. Supp. 2d 219, 225 (E.D.N.Y. 2009)); and, therefore, the bankruptcy court's findings of fact and conclusions of law were sufficient for appellate review. *Id.* at \*15.

II.

This court reviews "the decision of a district court, sitting as an appellate court, by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court". *In re TransTexas Gas Corp.*, 597 F.3d 298, 304 (5th Cir. 2010) (citation and internal

quotation marks omitted).  The bankruptcy court's findings of fact are reviewed for clear error; its conclusions of law, *de novo*.  *In re Morrison*, 555 F.3d 473, 480 (5th Cir. 2009) (citation omitted).  "[S]trict application of the clearly-erroneous rule is particularly important where, as here, the district court has affirmed the bankruptcy judge's findings".  *Orix Credit Alliance, Inc. v. Harvey* (*In re Lamar Haddox Contractor, Inc.*), 40 F.3d 118, 120 (5th Cir. 1994) (citation and internal quotation marks omitted).  A factual finding is clearly erroneous when, "although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed".  *Id.* (citation and internal quotation marks omitted).  In addition, "[t]he bankruptcy judge's opportunity to make first-hand credibility determinations entitles its assessment of the evidence to deference".  *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003) (citation omitted).

A court acting as the trier of fact "must find the facts specially and state its conclusions of law separately".  Fed. R. Civ. P. 52(a)(1).  Nevertheless, findings "are not a jurisdictional requirement of appeal.  Furthermore, cursory findings and conclusions or even the complete lack of findings and conclusions does not necessarily require [reversal] if a full understanding of the issues on appeal can nevertheless be determined by the appellate court".  *In re Tex. Extrusion Corp.*, 836 F.2d 217, 221 (5th Cir. 1988) (citations omitted).

## III.

After reviewing the record and the briefs, and essentially for the reasons stated by the bankruptcy and district courts in their well-reasoned opinions, the judgment is AFFIRMED.