Specifin Mgt. LLC v Elhadidy (2021 NY Slip Op 06578)





Specifin Mgt. LLC v Elhadidy


2021 NY Slip Op 06578


Decided on November 24, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:November 24, 2021

530082

[*1]Specifin Management LLC, as Assignee of GTA Asset Based Fund, a Segregated Series of IFUNDS LLC, Respondent,
v
Nabil Ahmed Elhadidy et al., Appellants, et al., Defendant.

Calendar Date:October 19, 2021

Before: Garry, P.J., Lynch, Clark, Reynolds Fitzgerald and Colangelo, JJ.


Mandelbaum Salsburg PC, Roseland, New Jersey (Boris Peyzner of counsel), for appellants.
McLaughlin & Stern LLP, New York City (Chester R. Ostrowski of counsel), for respondent.


Lynch, J.
(1) Appeal from a judgment of the Supreme Court (Crowell, J.), entered August 12, 2019 in Saratoga County, upon a decision of the court in favor of plaintiff, and (2) motion to file a supplemental record.
Defendant Nabil Ahmed Elhadidy is a medical doctor and president of defendant Heliopolis Medical, P.C., a professional corporation that provided no-fault medical examinations in connection with motor vehicle accidents. In May 2014, Heliopolis entered into a "No Fault Medical Claim Flow Funding and Security Agreement" (hereinafter the security agreement) with GTA Asset Based Fund (hereinafter GTA), under which GTA agreed to provide Heliopolis with up to $2,500,000 in funding for its operating expenses, using Heliopolis' accounts receivables as both collateral and the basis on which funds would be loaned. Correspondingly, Heliopolis and GTA executed an "Assignment Agreement" which, in part, authorized GTA to recover expenses and counsel fees in the event of a breach of contract.
In accordance with the security agreement, GTA advanced a gross total of $370,472.13 to Heliopolis between June and July 2014.[FN1] Heliopolis, in turn, assigned to GTA all of its rights to the proceeds of certain no-fault insurance medical receivables (hereinafter the medical receivables), which had a total face value of $756,065.58. In or around August 2014, Heliopolis ceased its operations. Taking the position that the business cessation constituted a breach of the security agreement, GTA terminated the agreement and gave Heliopolis and Elhadidy (hereinafter collectively referred to as defendants) notice of its intent to foreclose on the collateral — i.e., the outstanding medical receivables — by holding a public auction pursuant to the Uniform Commercial Code (see UCC 9-611). GTA was the only bidder at the public auction and purchased the collateral by way of a $50,000 credit bid, which it then credited against the outstanding balance of the loan.
GTA thereafter assigned its rights under the security agreement to plaintiff.[FN2] In April 2015, plaintiff filed an amended verified complaint against defendants [FN3] asserting, as relevant here, two causes of action for breach of contract [FN4] and seeking $279,479.92 in damages, plus statutory interest and counsel fees, on each breach of contract claim. Defendants answered, raised various affirmative defenses and interposed three counterclaims, including that GTA had breached the security agreement by wrongfully diverting ownership of the medical receivables to itself (hereinafter the third counterclaim).[FN5]
Following the exchange of discovery, plaintiff moved for partial summary judgment on its breach of contract claims and also sought dismissal of defendants' third counterclaim. Plaintiff emphasized that, under the security agreement, Heliopolis represented that it expected to generate medical receivables equal to at least $2,500,000 and would "not deviate from providing the stated scope of medical services . . . without prior [*2]notification to [l]ender." Notwithstanding such assurances, Heliopolis ceased operation of the business only a few months later. Plaintiff further alleged that defendants failed to pay the deficiency amount owed following the foreclosure sale that ensued. Defendants opposed the motion and cross-moved for summary judgment seeking dismissal of the amended complaint and a judgment in their favor on the third counterclaim to recover the surplus on medical receivables obtained by plaintiff.
By order entered October 24, 2017, Supreme Court granted plaintiff's motion on the breach of contract claims, denied plaintiff's motion seeking dismissal of the third counterclaim and denied defendants' cross motion in its entirety. As to the breach of contract claims, Supreme Court found that cessation of Heliopolis' business constituted a breach of the security agreement under the "clear and unambiguous" events of default enumerated therein. With respect to the third counterclaim, the court found that triable issues of fact existed, precluding judgment as a matter of law.
At the beginning of the ensuing bench trial, the parties represented that the third counterclaim had been discontinued in a written stipulation executed a week prior. Supreme Court acknowledged as much and began a bench trial solely on the issue of damages, at which the parties submitted evidence regarding the commercial reasonableness of the sale of the collateral and the amount of the credit bid submitted by GTA. Following the trial, Supreme Court, as relevant here, found that the foreclosure sale and the $50,000 credit bid were commercially reasonable under the Uniform Commercial Code, and that defendants were jointly and severally liable for contractual damages in the amount of $201,104.25 (representing the uncollected principal balance on the total advance amount under the security agreement, less the $50,000 credit bid), plus prejudgment interest at a rate of 9% per annum from September 19, 2014 — the date of the foreclosure sale — until entry of a final judgment. The court also found that plaintiff was entitled to counsel fees and litigation expenses in the amount of $240,000, with prejudgment interest at a rate of 9% per annum from the first day of the trial until entry of the final judgment. A judgment memorializing the awards was entered on August 12, 2019. Defendants appeal from the judgment [FN6] and seek leave to supplement the record on appeal.
With respect to defendants' motion to supplement the record, they argue that they should be allowed to include a written copy of the stipulation discontinuing the third counterclaim. Plaintiff opposes the motion on the ground that the stipulation was never "so-ordered" by the trial court or otherwise duly entered. Although "[d]ocuments or information that were not before [the trial court] cannot be considered by this Court on appeal" (Xiaoling Shirley He v Xiaokang Xu, 130 AD3d 1386, 1387 [2016] [internal quotation marks and citations [*3]omitted], lv denied 26 NY3d 904 [2015]; see CPLR 5526), the record demonstrates that the stipulation resulted from a mutual accord between the parties, contained all of the material terms of the agreement, and was submitted to and approved by Supreme Court (see generally Hallock v State of New York, 64 NY2d 224, 230-231 [1984]; Birches at Schoharie, L.P. v Schoharie Senior Gen. Partner LLC, 169 AD3d 1192, 1194 [2019]).
To that end, the copy of the stipulation that defendants seek to include in the record was signed by counsel for both parties on March 26, 2019. It provides that the third counterclaim "shall be, and hereby is, discontinued pursuant to [CPLR 3217 (a) (2)] . . . without prejudice to any right of [d]efendants to appeal the determination [of Supreme Court] that Heliopolis . . . breached the relevant [security agreement] and to reinstate the [t]hird [c]ounterclaim in the event that such determination is reversed on appeal." Plaintiff's counsel sent an email to Supreme Court that same day advising that the parties had "agreed to discontinuance of [the] [t]hird [c]ounterclaim, subject to the conditions set forth in the attached stipulation." During a court appearance on April 1, 2019, Supreme Court noted that the third counterclaim had been withdrawn and plaintiff's counsel reiterated that he had submitted a stipulation the week prior discontinuing the counterclaim. Moreover, in its posttrial order entered in July 2019, Supreme Court stated that the third counterclaim "was discontinued by and through a [j]oint [s]tipulation approved by the [c]ourt, on the record, on April 1, 2019." As the stipulation was signed by counsel for both parties, contained all of the material terms of the agreement, and was provided to and approved by the trial court, we conclude that it is valid and enforceable and grant defendants' request to supplement the record to include this document (see generally CPLR 5526).
As to the merits, we find no basis to disturb Supreme Court's determination that defendants breached the security agreement by closing operations only a few months into the 18-month term of the agreement. It follows that defendants' withdrawal of their third counterclaim under the stipulation remains binding. With respect to the trial, defendants argue that Supreme Court abused its discretion in permitting one of plaintiff's witnesses to provide expert testimony as to the commercial reasonableness of the sale of the collateral. Generally, "'expert opinions are admissible on subjects involving professional or scientific knowledge or skill not within the range of ordinary training or intelligence' of the trier of fact" (Matter of Suzanne QQ. v Ben RR., 161 AD3d 1223, 1225 [2018], quoting Matter of Nicole V., 71 NY2d 112, 120 [1987]). "Before admitting expert testimony, a court must determine whether a proposed expert possesses the requisite skill, training, education, knowledge and/or experience to qualify as an expert on the particular matter [*4]at issue in light of prevailing professional standards" (Matter of April WW. [Kimberly WW.], 133 AD3d 1113, 1115 [2015] [internal quotation marks, brackets, ellipsis and citations omitted]; see Matott v Ward, 48 NY2d 455, 459 [1979]). "[A] witness's qualification to testify as an expert rests in the discretion of the trial court, and its determination will not be disturbed in the absence of serious mistake, an error of law or abuse of discretion" (Werner v Sun Oil Co., 65 NY2d 839, 840 [1985]; see Matter of April WW. [Kimberly WW.], 133 AD3d at 1115; Hurrell-Harring v State of New York, 119 AD3d 1052, 1053 [2014]).
At trial, plaintiff called Margaret A. Ceconi to address the commercial reasonableness of the collateral sale. As to her qualifications, Ceconi testified that she has a Bachelor's degree in accounting and is employed as a senior managing director at Encina Business Credit, where she provides underwriting services. She had also taken "numerous seminars and training classes regarding . . . collateral foreclosure litigation." Ceconi explained that she had over 25 years of experience in commercial and corporate based asset lending and had been involved with over 10 foreclosure sales, at least one of which dealt with medical receivables. She also had prior experience working with loans secured by outstanding medical receivables. During voir dire, defense counsel elicited testimony indicating that Ceconi's prior experience with medical receivables was dated and she did not have specific experience with medical receivables involving no-fault insurance claims under New York law. Responding to whether she was "familiar at all" with New York law concerning no-fault medical receivables, Ceconi attested to "read[ing] some of the [Uniform Commercial Code] [l]aws regarding medical receivables and foreclosures," and "reach[ing] out to people that . . . currently lend into the medical industry space . . . and talk[ing] to them about their advance rates and issues that they have in lending in th[at] space."
On this record, we conclude that Supreme Court did not abuse its discretion in permitting Ceconi to provide expert testimony as to the commercial reasonableness of the collateral sale and, more particularly, the credit bid (see O'Connor v Kingston Hosp., 166 AD3d 1401, 1403 [2018]; Matter of Marx v McCall, 306 AD2d 797, 799 [2003]; see also Cerretani v Cerretani, 289 AD2d 753, 754 [2001]). We agree with Supreme Court that Ceconi's lack of specific experience with the recovery of medical receivables under New York's no-fault insurance law goes to the weight of her testimony, not its admissibility (see O'Connor v Kingston Hosp., 166 AD3d at 1403; see Doviak v Finkelstein & Partners, LLP, 137 AD3d 843, 847 [2016]; Rojas v Palese, 94 AD3d 557, 558 [2012]; Pember v Carlson, 45 AD3d 1092, 1094 [2007]).
With respect to the collateral sale, the parties recognize that the sale was governed by the relevant provisions of the Uniform Commercial Code[*5]. As pertinent here, UCC 9-610 (b) specifies that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." We agree with Supreme Court that the procedural aspects of the sale met that standard (see GMAC v Jones, 89 AD3d 985, 986 [2011]; Sumner v Extebank, 88 AD2d 887, 888 [1982], mod 58 NY2d 1087 [1983]). The record confirms that GTA sent defendants a proper notice of a public sale 10 days in advance of the sale and also published the notice in the New York Post (see UCC 9-611, 9-612, 9-613). Notably, the parties were in contact just prior to the sale, which was held in the offices of GTA's counsel on September 19, 2014 at 10:00 a.m. Defendants failed to attend and GTA was within its rights, as a secured creditor, to submit a bid (see UCC 9-610 [c] [1]).
The question remains as to whether the $50,000 credit bid constituted a commercially reasonable price for the medical receivables. In reviewing a nonjury verdict on appeal, this Court has broad authority to independently weigh the evidence and render a judgment warranted by the facts, while according due deference to the trial court's credibility assessments (see Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499 [1983]). Supreme Court accepted Ceconi's opinion that the $50,000 credit bid was commercially reasonable given the factors known at the time of sale. We are not so persuaded. Ceconi cited to several factors supporting the bid amount, including the closure of the business, the lack of cooperation by Elhadidy and his diversion of an unknown amount of funds. Ceconi explained that her "biggest concern" was defendants' termination of the staff employee charged with preparing the documentation to support a claim. Ceconi reasoned that, without that employee, plaintiff was unable to discern whether the proper documentation existed to submit potential claims for payment. The fundamental flaw in Ceconi's reasoning is that she ignored the fact that the documentation for the claims at issue had already been approved by the billing company and accepted by plaintiff before any funds were even advanced to defendants. Ceconi's reasoning indicates that she was unaware of the actual structure for advancing funds under the security agreement.
The testimony of plaintiff's representative, Alfred F. Marrapodi, is telling in this regard. Marrapodi explained that the type of loan at issue here was "extremely risky" but "the whole concept behind [plaintiff's] business . . . was [to] engineer a process that would be effective and efficient" to minimize the risks of collection. To that end, the security agreement required Heliopolis to hire a billing company to handle the claims process, as well as counsel to pursue collections. Most importantly, before any funds were advanced to Heliopolis, the billing company was required to submit to plaintiff a schedule of acceptable claims receivables[*6], together with "all [s]upporting [d]ocumentation relating thereto," as well as any additional documentation that the lender required. Only upon plaintiff's approval of the claims schedule would funds be advanced. Significantly, the advance amount was limited to 49% of the total amount of the approved claims schedule. The direct point here is that the supporting documentation for the claims at issue was already in plaintiff's hands. Not to be overlooked is the fact that the lender's fee was dependent upon the viability of the billing structure outlined in the security agreement, and the parties also signed a "[l]ockbox [a]greement" by which payments from the insurance carriers would be paid into an escrow account.
It is important to recognize that plaintiff assumed the risk of actually collecting on the accounts receivables in order to earn a lender's fee. In fact, the security agreement authorized plaintiff to retain all funds recovered, but not more than 75% of the approved claim schedule. The point made is that plaintiff had a sophisticated structure in place to limit the risk of advancing funds even when, as here, the borrower ceased operations. As it turns out, that structure worked well — after the sale, plaintiff collected a gross total of $391,956.82 on the outstanding medical receivables. By comparison, Ceconi described the situation as a "lender's worst nightmare" — a characterization that failed to account for the protections outlined in the security agreement.
As for the specific amount of the credit bid, Marrapodi admitted that he did not determine the amount, but relied on counsel handling the collateral sale to do so. For her part, Ceconi acknowledged she did not inquire of counsel as to how the $50,000 amount was derived. We take note that Ceconi also erroneously testified that collections counsel was not retained until after the sale. She further speculated that "there was no way to know that there wasn't hundreds of thousands of dollars that had . . . been diverted" by Elhadidy prior to the sale — but there is no proof in this record of the actual amount, if any, diverted.
Our focus turns to the reasonableness of the bid amount. As explained in the official comment to UCC 9-610, a "low price" alone does not establish a violation but should compel a court to "scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable" (UCC 9-610, Official Comment No. 10; see UCC 9-627 [a]; Bankers Trust Co. v Dowler & Co., 47 NY2d 128, 134-135 [1979]). Where, as here, the secured party has purchased the collateral, the method for calculating any deficiency or surplus is outlined in UCC 9-615 (f). Specifically, that amount "is calculated based on the amount of proceeds that would have been realized in a disposition complying with this part to a transferee other than the secured party . . . if . . . the amount of proceeds of the disposition is significantly below the range of proceeds [*7]that a complying disposition to a person other than the secured party
. . . would have brought" (UCC 9-615 [f] [2] [emphasis added]; see UCC 9-626 [a] [3], [4], [5]). The underscored phrase defines the standard that applies here.
In our view, the $50,000 credit bid was "significantly below" what a commercially reasonable bid would have been (UCC 9-615 [f] [2]). The 49% advance rate and billing structure outlined in the security agreement were designed to reduce the risks of collection. By her own account, Ceconi explained that "a 49 percent advance rate indicates that the dilution, as we term it in the industry, would range between 20 to 40 percent at any given time." In other words, one could expect not to recover up to 40% of the collateral based on a 49% advance rate. Applied here, where the outstanding face value of the collateral amounted to $673,744.91 on the date of the foreclosure sale, a 40% dilution rate would yield an expected recovery of $404,246.95. We note, moreover, that the credit bid was only about 7.5% of the value of the collateral.
We find that the credit bid was "significantly below" what a commercially reasonable bid should have been under the standard set forth in UCC 9-615 (f) (2) (see Federal Deposit Ins. Corp. v Herald Sq. Fabrics Corp., 81 AD2d 168, 185 [1981], lv dismissed 55 NY2d 747 [1981], appeal dismissed 55 NY2d 602 [1981]; General Elec. Credit Corp. v Durante Bros. & Sons, 79 AD2d 509, 510 [1980]; compare In re Adobe Trucking, Inc., 551 Fed Appx 167, 172-173 [5th Cir 2014] [credit bid amounting to 67% of the alleged value of the collateral was commercially reasonable]; Crossland Mtge. Corp. v Grankel, 192 AD2d 571, 571-572 [1993] [sale of collateral for around 35% of its market value deemed commercially reasonable], lv denied 82 NY2d 655 [1993]; Frank Buttermark Plumbing & Heating Corp. v Sagarese, 119 AD2d 540, 540 [1986] [same], lv denied 68 NY2d 607 [1986]). As a consequence, we conclude that there is no deficiency due to plaintiff (see UCC 9-626 [3], [4], [5]). It follows that Supreme Court erred in awarding plaintiff damages for breach of contract.
We further reject defendants' contention that the security agreement was void ab initio because it was structured in such a manner as to create a criminally usurious interest rate (see Penal Law § 190.40). Although defendants raised usury as an affirmative defense in their answer, they never made this argument in their summary judgment cross motion or at trial, instead asserting it for the first time on appeal. As such, we find defendants' contention unpreserved (see CPLR 5501; Albany Eng'g Corp. v Hudson River/Black Riv. Regulating Dist., 110 AD3d 1220, 1223 [2013]). Even assuming, without deciding, that the fee structure set forth in the security agreement can be properly considered interest, "the transaction is exempt, under General Obligations Law § 5-501 (6) (b), from the operation of any law regulating the payment of interest" insofar as GTA [*8]agreed to provide advances aggregating $2,500,000 (Tides Edge Corp. v Central Fed. Sav., 151 AD2d 741, 742 [1989]).
Finally, with respect to the award for counsel fees and expenses, Supreme Court noted in its posttrial order, entered July 18, 2019, that defendants had agreed that plaintiff was entitled to an award of fees and expenses totaling $240,000. Defendants fail to plausibly dispute that contention in their brief.
Garry, P.J., Clark, Reynolds Fitzgerald and Colangelo, JJ., concur.
ORDERED that the motion is granted, without costs.
ORDERED that the judgment is modified, on the law, without costs, by vacating so much thereof as awarded plaintiff the principal sum of $201,104.25 with interest, and, as so modified, affirmed.



Footnotes

Footnote 1: The total gross advance amount was calculated based upon the 49% advance rate set forth in the security agreement. After certain fees and other monies were taken out in accordance with the terms thereof, the net amount advanced to Heliopolis was $295,621.64.

Footnote 2: GTA's president, Alfred Marrapodi, acknowledged that GTA changed its name to Specifin Management LLC, the named plaintiff herein, as a result of the events at issue.

Footnote 3: The amended verified complaint named Elhadidy's wife as a defendant and the third cause of action was directed at her. However, this cause of action was later discontinued by joint stipulation.

Footnote 4: One of the breach of contract claims was asserted against Elhadidy in his personal capacity and the other was asserted against Heliopolis in its corporate capacity. The amended complaint also asserted two causes of action for conversion, which have since been dismissed or discontinued.

Footnote 5: The first and second counterclaims were subsequently discontinued with prejudice by joint stipulation.

Footnote 6: The notice of appeal includes Elhadidy's wife as an appealing party, but, as noted above, the third cause of action was discontinued as against her by joint stipulation.